UNITED STATES of America

v.

William Leonard RADNEY, a/k/a Lamar Radney, and Patricia G. Moore a/k/a Patricia Radney.

Crim. No. 79–G–00160–S.

United States District Court, N. D. Alabama, S. D.

Jan. 8, 1980.

Ann Carroll Robertson, Asst. U. S. Atty., Birmingham, Ala., for plaintiff.

Robert R. Bryan, Bryan, Wiggins, Quinn & Appell, Birmingham, Ala., for Patricia Radney.

David Chip Schwartz, Birmingham, Ala., for Lamar Radney.

## MEMORANDUM OPINION

GUIN, District Judge.

This cause came before the court for hearing upon motions by defendants for new trial. Defendants had been tried and convicted of violating 18 U.S.C. § 2423, transporting or facilitating the transportation of a minor across state lines with the intent to have the minor engage in prostitution or other prohibited sexual conduct. This conviction came after the case ended in mistrial once due to a juror's viewing a television interview of two of the witnesses and its then having been tried to conclusion with a new jury.

The court believes that the basic sequence of events in this case must be laid out as a preface to its opinion in order for it to be understandable to one who was not present through or involved in all stages of the proceedings. A skeleton of the testimony and recantations will be laid out so that one may thread his way through the maze of testimony and recantations and the bases therefor. The motions for new trial were based primarily on recantations by two of the key witnesses for the prosecution, Sharon Denise Moreland and Teresa Darlene Adkins, two of the minors whom the Radneys were convicted of transporting across state lines for illegal purposes. There were other grounds of motion, but they were so obviously not well taken that no discussion is necessary.

Sharon Denise Moreland's testimony to the grand jury, at the first trial, and at the

second trial, was consistent, supporting the prosecution's position that a trip from Birmingham, Alabama, to Atlanta, Georgia, planned by and participated in by the defendants, did take place and that the three minor girls were indeed transported in interstate commerce for the purpose of prostitution. Miss Moreland recanted her grand jury testimony via an affidavit given in the office of Patricia Radney's attorney (the lead trial attorney) between the hearing before the grand jury and the first trial.[1] She subsequently testified at the first and second trials consistently with her grand jury testimony. Miss Moreland recanted her trial testimony in a different manner from her first recantation in an affidavit given in Mr. Bryan's (Patricia Radney's attorney) office on September 10 and 11, 1979, and at hearing on the motion. Her testimony at the motion hearing was clearly unworthy of belief.

Teresa Darlene Adkins testified at both trials consistently with her grand jury testimony and in support of the guilt of the defendants. She admitted at the hearing on the motion that the recantation she had given by affidavit on September 10 and 11, 1979, in attorney Bryan's office was a fabrication and that her trial testimony was in fact true. She, thus, recanted her recantation.

This court finds specifically that Sharon Moreland committed perjury in open court when she recanted the testimony she had given previously to the grand jury and in two trials of the defendants before this judge and two different juries. She has told three different sworn stories. It is a fair inference from the evidence heard by the court during the trial, and this court so finds, that William Leonard "Lamar" Radney, one of the defendants, suborned her to recant the first time (between the grand jury testimony and the first trial). The court also finds from the evidence and from personal observation of the witness that Sharon Moreland appears to be in love with Lamar Radney, is pregnant with a baby which she in good faith believes to be his

child, that she is weak-minded, easily led and influenced, is of tender years (barely 16 years of age at the present time, 15 years of age when she became pregnant and when the events involved in the case took place), and that she is an interested witness at the present time, with a bias in favor of Lamar Radney. Her testimony on the motion is unworthy of belief. Her demeanor on the witness stand during the hearing on the motion for new trial was different from her demeanor during the two jury trials. The court observed her demeanor during the two jury trials and compared her testimony with that of the other two key prosecution witnesses, Brenae Rowe and Teresa Adkins, and concluded that while there were discrepancies among the stories of the three witnesses, the discrepancies were minor and such as would be expected from truthful witnesses recounting an involved incident in the past. The stories were complex and difficult for persons of tender years to concoct and memorize in detail so well that the substantial and relevant portions agreed while certain immaterial portions disagreed. The court finds, therefore, that the trial testimony of all three of these young girls was essentially true. If the court had been the trier of fact, the court would have found the defendants guilty, and would have had no difficulty in making such a finding.

Brenae Rowe told her story the very night of the alleged robbery at the Radney home. The court declines to make any finding concerning the nature of this incident since it is outside the scope of this case. However, its occurrence is significant so far as it bears upon the spontaneity and veracity of Miss Rowe's remarks made on that evening. Miss Rowe was 15 years old at the time and under the stress of circumstances of that evening it is inconceivable that she made up such an elaborate story, which included an accusation against the defendants of operating a ring of teenagers engaged in both prostitution and shoplifting. She included an allegation of an incident of interstate operation of the ring for

---

1. This first recantation was before both trial juries and is an undisputed part of the record.

both purposes. At the first opportunity to talk with the police officer without the presence of any other person, she told the same lengthy, bizarre, rather complex story which she later told at both trials, complete with the interstate feature. Such a story must have been true when told under such circumstances. The other two girls told the same story upon being approached by investigators, and later before the grand jury and at the trials, and without significant variation, but with minor variations indicating honesty on the part of the witnesses. These facts further indicate veracity. Brenae Rowe is unsophisticated and weak-minded, as is Sharon Moreland. Teresa Adkins is strong-minded and relatively intelligent, although badly misguided, and this court is not fooled into believing she is a totally unsophisticated "child." She is really a pretty hard character, although because of her deprived background, and the fact that she really is young, there are good reasons to sympathize with her and to hope that she will change her apparent direct course toward a life of crime and vice. Nevertheless, she was only 15 years old when the events involved in the case took place, and although she appears to be reasonably intelligent, her background, age and courtroom demeanor do not support an assessment of her as bright or particularly sophisticated. The court would classify the other two girls well below Miss Adkins in intelligence and sophistication. Both the other girls clearly could be very easily led and influenced.

Although Teresa Adkins is somewhat more intelligent than the other two girls, the court does not believe that she is sufficiently clever to have concocted this entire story and trained the other two girls to tell it as well as they did through two lengthy trials under searching and highly competent cross-examination. All three of them stood up well under cross-examination, and the variations in the stories concerned relatively insignificant details which would indicate truthfulness on the part of the witnesses

rather than untruthfulness. The essentials of the story were consistent. It is inconceivable that either the Moreland or the Rowe girl concocted the story. From close observation of these witnesses through three hearings, the court concludes that they are simply too weak-minded to have done so. If anyone in the case concocted the story, it would have to have been Teresa Adkins. Since Brenae Rowe told the story the night of the alleged robbery to the first officer she could get alone to tell it to, and since evidence of her having done so is in the record without contradiction, the court can draw only one conclusion—the story is true; it was not invented by Rowe, nor was it concocted by Adkins. The testimony of Moreland at the motion hearing was willful perjury, committed by a biased and interested witness. She has a motivation to keep Lamar Radney out of prison in the hope of making him support the child she was about to bear,[2] which she swears is his. If he goes to prison for ten years, obviously she can get no child support from him. Since the court is convinced that the logical inference is that Lamar Radney procured the false testimony given by Moreland in the form of an affidavit in July attempting to recant her grand jury testimony, and which in itself contradicts her testimony given in support of the motion, the government should investigate and consider the possibility of bringing perjury charges against Moreland and subornation of perjury charges against Lamar Radney.

It is very significant that in July, in this affidavit recanting her grand jury testimony, Moreland swore that there was *no trip to Atlanta* by anyone involved in the case. At both trials she swore that all three girls and both Radneys went to Atlanta. On the motion, she swore that only the three girls and Patricia Radney went to Atlanta. At the first trial, the government proved by overwhelming evidence of eyewitnesses in Atlanta that Patricia Radney had been caught shoplifting with Teresa Adkins in

---

2. The child should have been born by the time of filing of this opinion, but had not been born at the time of the motion hearing.

Atlanta on the occasion of that trip, so that it could not successfully be denied that Patricia Radney made the trip. Consequently, it was abundantly clear that the testimony by affidavit given by Moreland in July that no trip at all took place was false. Obviously, if perjury was to be suborned for the motion hearing, it would be folly to suborn the same perjury which occurred in July, since that version had already been resoundingly discounted by the government at the first trial when it was clearly established that Patricia Radney did in fact make a trip to Atlanta with at least one of these three girls on the occasion in question. It is all too convenient that the false testimony given to this court at the second trial by Patricia Radney was to the effect that Lamar Radney, and only Lamar Radney, failed to make the Atlanta trip. Neither of the Radneys testified at the first trial before the mistrial was declared. At the second trial, Patricia Radney testified; Lamar did not. The false testimony by Moreland at the motion hearing and by Patricia Radney at the second trial included the assertion that Patricia Radney had no knowledge of the prostitution which took place in Atlanta, but it is significant that the change in story was primarily aimed at the federal feature of the prosecution—the interstate transportation of minors for the purpose of prostitution. (The "change" was not a change in testimony as such for Patricia Radney, since neither Radney testified at the first trial. However, there was a change from what defense counsel stated in opening statement his evidence would show at the first trial. There was also a change in the sense that, before the mistrial was declared at the first trial, defense counsel did produce witnesses who were offered in an attempt to prove that Lamar Radney did not go to Atlanta at all, and that Patricia Radney went alone to pick up a friend, this being the defense position presented in opening statement.)

This manipulation of the interstate facet of the case is one of the main reasons the court cannot believe that Brenae Rowe made up the story out of whole cloth. If she had wanted to get the Radneys in trouble, as they contend, it is clear enough from the testimony that they had a house full of stolen goods, that they were running a shoplifting ring of teenage girls, that they were training them both to steal and to prostitute, and that a great deal of trouble could have been made for the Radneys without the necessity of bringing in the crossing of the state line. After all, it is against the law of Alabama to steal and to conspire to steal, and it is against the law of Alabama to pimp and to conspire to operate a ring of prostitutes. This court does not believe that the interstate feature of the story was made up by a weak-minded 15-year-old girl as part of a plot to "get" the Radneys. She knew the house was full of stolen goods (this being admitted by Patricia Radney), and she could have made plenty of trouble by just referring to that alone. She knew Lamar Radney was a pimp for a group of teenage prostitutes, whether any interstate transportation was involved or not, and it would not have occurred to her to work interstate transportation into the story had it not actually taken place. She is not a lawyer, nor anything even approaching being learned in the law, and the importance of interstate transportation would be totally lost upon her without careful explanation. She told her story entirely too soon for the interstate portion of it to have had any significance to her, unless it was simply the truth.

This court never thought it would live to see the Oliver Twist story reenacted in this day and time, in fact not only reenacted in real life but compounded by even more egregious crimes than were committed by the fictional Fagin. Fagin trained young boys to steal for his profit. The Radneys trained young girls to steal for their profit and also to prostitute themselves for their profit. Patricia Radney was the teacher in both criminal activities. Lamar Radney was the "kingpin" of both phases of the operation, and took all the profits, as did Fagin from his boys. The Radneys lived unusually well from the criminal activities of the young teenagers they trained in these criminal activities. It is patent that

when the court decided their egregious crimes merited the maximum sentence, there was a sense of shock on the part of at least Teresa Adkins, who has expressed herself in open court to this effect, and this shock motivated her recantation, which she in turn retracted, both before and as a part of her testimony at the hearing on the motion for new trial. She admitted the recantation was a lie.

■ The defense has tried to show that Teresa Adkins was improperly influenced by the prosecution. The court finds to the contrary. Specifically, the court finds that Assistant United States Attorney Ann Robertson did not improperly influence her witness by lending decent clothes for her to wear, since otherwise she would have had nothing but rags to wear to court. Additionally, the court finds that Ann Robertson's compassionate act of baking and delivering a birthday cake to this unfortunate girl between the two trials was not a breach of ethics nor was it an attempt to improperly influence the witness. At that time, Adkins had told a consistent story to the investigators, the grand jury, and the first trial jury. There was no reason or need to influence Adkins' testimony.

■ The defense further contended that Assistant United States Attorney Mel Alexander acted improperly by answering Teresa Adkins' question concerning the possibility of prosecution for the false affidavit she gave Robert Bryan, one of the defense counsel. The question came after she had already admitted to the prosecutors, Robertson and Alexander, in the office of the United States Attorney of this district, that her affidavit to Bryan was false and that her testimony at both trials was true. As a natural expression of concern, she asked them, having already admitted she had lied to Mr. Bryan under oath, whether she could be prosecuted for it. Mr. Alexander's truthful negative answer to that question was not given for the purpose of influencing her change of testimony from falsehood back to truth, nor did it have that effect, since the change had already taken place. The accusation against Mr. Alexander ig-

nores the evidence and is improper in itself and should not have been made.

It should also be noted that Moreland contradicted herself in the two interview-affidavits given Bryan, telling a different story on Tuesday than the one she told on Monday about whether she had sold sex in Atlanta. This is further reason not to believe her "recantation." Even this second "recantation" (the first one was in July) is at least in part a self-contradiction. For these many reasons the recantation is unworthy of belief. Her demeanor on the witness stand during the motion hearing was that of a perjurer. She appeared frightened and confused, glancing frequently at defendants as if for reassurance. The court thought her demeanor on the witness stand at the two jury trials was that of a truthful witness. She listened attentively and sometimes asked that a question be explained. Although she sometimes was slow in answering, this hesitancy was one of slow comprehension rather than frightened confusion. She was plainly a different person when she testified at the motion hearing. She did not testify convincingly on the motion and the court is totally convinced that she was lying, both because of her demeanor and because of the many reasons detailed herein.

Among other circumstances, the court has considered the fact that Lamar Radney drove Sharon Moreland to his lawyer's office in July 1979, where she made her first recantation, which is different from the one she later made and is offered to this court in support of the motion for new trial; that she admits she is emotionally attached to him and is carrying a baby she is convinced is his; that this emotional attachment of hers has survived two violent physical attacks on her by him, which she testified to before the jury and which she not only did not recant but, in fact, specifically reaffirmed under oath to this court. If such feelings have survived two violent attacks, one of which included kicking her in the head and requiring hospital emergency room treatment, that survival supports an inference that she would lie for him, fur-

ther supporting the court's finding that she did lie.

The age of the witnesses has also been considered and the nature of the relationship between Lamar Radney and the recanting witness or witnesses (however that may be viewed, since one recantation has now been recanted). That relationship was one of pimp and prostitute, a notoriously close psychological relationship difficult for the person not trained in psychology to understand. Why a woman will give her body to other men for money and then turn the money over to her pimp, as the court judicially knows is customary among pimps and prostitutes, and as was the custom between these prostitutes and this pimp, is very difficult to understand. Nevertheless, whatever the psychological reason may be, that was the relationship here, and it is a very close and strong psychological relationship of dependence of the woman on the man. Whether an overt attempt was made by the pimp to obtain recantation by the prostitutes, it is not necessary for this court to find. The thought of the pimp going behind bars for 10 years may well have been enough psychologically to trigger the reaction which led these two young girls to recant. On the other hand, the relationship was not so strong that one of the two of them was willing to maintain her recantation once the seriousness and possible consequences of perjuring herself began to sink in.

The court has also considered the great amount of corroborated testimony received at both jury trials. There can be no doubt that Patricia Radney was in Atlanta, because she was caught shoplifting by two eyewitnesses who positively testified as to the occasion and the date, backed by store records clearly indicating that there was only one possible date that these two employees could have been in the store at the same time, at the given time of day during the week in question, making it absolutely certain that there was no mistake about the date.

There is no question that Mr. Radney called his tailor on the morning of the day of the Diana Ross concert to see if his new suit was ready so that he could wear it to that concert. The tailor testified to that fact. The testimony showed this day was the Saturday following the Friday night on which Patricia Radney and Teresa Adkins were caught shoplifting in Atlanta and during which the acts of prostitution at issue in this case took place. The tailor testified that Mrs. Radney did not call him that day. The telephone company records clearly show that two telephone calls were made from the Atlanta hotel where Mrs. Radney was registered to Birmingham, one to the Radney house where the children were being kept by a relative, and the other to Mr. Radney's tailor on the day of that concert. Patricia Radney was identified by two eyewitnesses as having been in Atlanta on the night previous to those phone calls. She claimed when she took the stand at the second trial to have made both calls. This contention was contradicted by the testimony of the tailor. The only reasonable inference is that Mr. Radney made the call to the tailor. This being true, he had to have been in Atlanta. This logical conclusion clearly contradicts the testimony of Patricia Radney and the testimony of Sharon Moreland at the motion hearing. Moreland's testimony is plainly perjured, as is that of Patricia Radney.

The circumstances under which the September 1979 statements were made, given by Moreland and Adkins at defense counsel's office, must also be examined. Neither of them was sworn in until some 45 pages of transcript had been recorded, and they were deposed in the presence of each other rather than separately. Testimony by Adkins at the hearing on the motion revealed that the statements given on September 10 and 11, 1979, came after both girls had visited with both defendants and after Adkins, at least, had been caused to feel what she described as "pressure" from them. The statements given defense counsel on September 10 and 11 are internally inconsistent concerning whether there was any prostitution in Atlanta at all (pages 10 and 65). Further, at the motion hearing Moreland could offer no explanation as to

why she gave a statement (her *first* "recantation") on July 22, 1979, to Lamar Radney's defense counsel at the urging of Lamar Radney, which in substance maintained that Moreland had not gone to Atlanta with Lamar or Patricia Radney and that no trip to Atlanta had taken place for any purpose.

Moreland testified at both trials that she had given the July statement at Lamar's direction to help him and yet, when asked why she had not told that there had been a trip but without Lamar, and without prostitution, if that were the truth, she could offer no explanation. She was a very unsatisfactory witness on the motion. On the other hand, she had been a good witness for the government, consistent as to the relevant questions, at both jury trials, despite vigorous and savage cross-examination by a skilled and able defense counsel, who maintains offices both in San Francisco and Birmingham, whose services are known to the court to be widely sought in criminal cases, and who has been elected a Fellow of the American Board of Criminal Lawyers, a national honorary organization open only by invitation to attorneys who have tried a minimum of 50 jury trials, 35 of which were felony trials, and five major felony trials. This young, very unsophisticated (even slow-witted) girl could not have *twice* told the story she told, with its internal consistencies and its consistencies with the stories of the other witnesses, under such cross-examination by such an able lawyer, unless that story had in fact been the truth. No amount of coaching could have enabled her to survive the cross-examination she twice endured, as she did survive it, by telling any kind of lie.

Although the court realizes that statements made by counsel in opening statement are not evidence, they certainly are indicative of what counsel has been told by his clients and/or his witnesses, or he would, presumably, not make the statements. At the first trial, Mr. Robert Bryan said in his opening statement: "We expect the evidence to show that in fact Mrs. Radney did not take these girls to Atlanta." When Mrs. Radney finally took the stand, late in the second trial, she admitted that she took the girls to Atlanta, but denied that Lamar Radney went. This admission came after it was abundantly clear that she could not hope to convince anyone that she had not been in Atlanta, since she had been caught shoplifting as discussed above.

■ Furthermore, there is other evidence offered by the defense which is inconsistent with Moreland's testimony in support of the motion for new trial. At the first jury trial, the defendants offered the testimony of Gail and Wilbert Pope, who testified that Teresa Adkins could not have gone to Atlanta on April 19, 1979, because she was living with them at the time and did not leave their house or presence for any significant time during the pertinent time period. It was not until the second trial, after the defendants had an opportunity to see and hear the vast amount of corroborating evidence putting at least Mrs. Radney in Atlanta with the three prostitutes in question, that the defendants changed their tactics and their story, and maintained that the trip took place, but not for the purpose of prostitution and without Mr. Radney taking part in the trip. Only after the second trial, and a meeting at the home of the Radneys prior to going to the office of attorney Bryan to "recant" was Moreland able to attempt to offer an explanation for the trip consistent with the final story offered by Patricia Radney at the second trial. Clearly, Moreland's trial testimony at the two trials is to be believed and her recantation testimony before the court on the motion for new trial is false, utterly incredible, and totally unworthy of belief. The court does not believe it and totally discredits it.

Teresa Adkins admitted at the motion hearing that her trial testimony, at both trials, was true and that the statement she gave on September 10 and 11, 1979, to attorney Bryan was not true, and was given because she felt badly because the two Radneys had been given 10-year prison sentences.

It was stipulated that all three of the prostitutes in question gave numerous statements prior to the first jury trial which were consistent with the testimony they gave at both jury trials. There now having been an allegation of recent fabrication, under Rule 801 of the Federal Rules of Evidence the existence of these numerous prior consistent statements is to be considered by the court as substantive evidence, and the court does consider such evidence as further corroboration of the findings it has already made. However, the court wishes to emphasize that these findings would have been made whether these prior consistent statements existed or not.

The standards for granting a motion for new trial based on allegations of recanted testimony, which have been adopted by the Fifth Circuit, are stated in *United States v. Smith*, 433 F.2d 149 (5th Cir. 1970):

> "Recantation is 'looked upon with the utmost suspicion,' *Harrison v. United States*, 2 Cir., 7 F.2d 259, 262. Ordinarily, ' * * * a new trial should be granted when, (a) The court is reasonably well satisfied that the testimony given by a material witness is false. (b) That without it the jury might have reached a different conclusion. * * * ' [Citations omitted.]" *Newman v. United States*, 5 Cir. 1956, 238 F.2d 861, 862 f. 1.

433 F.2d at 150–51. Nothing presented at the hearing on the motion for new trial would support the granting of that motion under the test stated above.

Even without applying the test of "utmost suspicion" laid down by the Fifth Circuit, the court does not believe the recantation. The court would not accept the recantation in this case under any of the many possible legal standards which might be applied. The defendants have not overcome a burden of even slight suspicion. They have not overcome a burden of a preponderance of the evidence, if that were the law. In fact, the preponderance of the evidence is against the defendants, and in further fact, this court finds that beyond any reasonable doubt Sharon Moreland lied at the hearing on the motion for new trial;

Teresa Adkins told the truth, at least in substance as to the relevant issues; and both of them, along with Brenae Rowe, told the truth at the two jury trials.

This court is aware that its decision will not be disturbed on appeal except for an abuse of discretion. *Reno v. United States*, 340 F.2d 307 (5th Cir. 1965); *Meyers v. United States*, 310 F.2d 801 (5th Cir. 1962); *Ledet v. United States*, 297 F.2d 737 (5th Cir. 1962). This court is further aware that its discretion must be an informed one, and it has made specific findings based on the demeanor of the witnesses, the content of their testimonies and statements given at various times, and all the evidence taken at the two jury trials, as well as all the circumstances surrounding both the relevant facts in the case itself and the giving of the testimony by each witness on each different occasion. The court is totally convinced that its findings are correct. There is no shadow of doubt. In fact, the court would be willing, if that were the legal test, to say that it is convinced to a moral certainty that its findings are correct.

The government has thoroughly impeached the recantation in question here. Unlike the case of *United States v. Muckenstrum*, 515 F.2d 568 (5th Cir. 1975), where the district court was affirmed by the Fifth Circuit on a finding that the recantation of the government witness, Nevada Jean Robertson, was extremely suspect, here this court has specifically found that the recantation was a deliberate lie under oath, constituted perjury, and was perjury beyond any reasonable doubt and to a moral certainty.

Another Fifth Circuit case clearly explains the function of the district judge in a matter such as this:

> The function, on well-defined standards, is that of the District Judge for it is " * * * important for the orderly administration of criminal justice that findings on conflicting evidence by trial courts on motions for new trial based on newly discovered evidence remain undisturbed except for most extraordinary circumstances * * *." [Citation omit-

ted.] If the District Judge, on the basis of the whole record of the original trial and the matters presented on the hearing of the motion, believes the statements in the affidavit of recantation to be false and is not reasonably well satisfied that the testimony given by the witness on the trial was false, the decision is for him to reach for he is "not at liberty to shift upon the shoulders of another jury his own responsibility, but [is] charged with the responsibility to seek the truth himself * * *." [Citation omitted.]

*Newman v. United States*, 238 F.2d 861 at 862–63 (5th Cir. 1956) (footnote and citations omitted).

The jury believed these witnesses when they testified. At the time, the court believed them also. The court has carefully considered what has been offered to it in support of the motion, and still believes that the three girls told the truth at both trials, and believes that the statements given in the attorney's office on September 10 and 11 were false, that the statement given under oath in the presence of the court by Moreland was false, and consequently denies the motion. A separate order so ruling will be entered.