EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* CRUZ CHÉVERE HEREDIA y ÁNGEL M. CHÉVERE RIVERA, apelantes y peticionarios.

*Números:* CE-93-468
CR-93-66

*Resueltos:* 22 de agosto de 1995

1

2

*Peter Ortiz*, abogado de los apelantes y peticionarios; *Pedro A. Delgado Hernández, Procurador General*, abogado de El Pueblo.

El Juez Asociado Señor Fuster Berlingeri emitió la opinión del Tribunal.

## I

Tenemos ante nos una cuestión de primera impresión en torno a la aplicación de la Regla 192 de Procedimiento Criminal de Puerto Rico, 34 L.P.R.A. Ap. II.

La cuestión es si un tribunal, que no fue el que enjuició a los peticionarios, abusó de su discreción al denegar una solicitud de nuevo juicio, cuando la principal testigo de cargo —quien declaró en el juicio haber sido víctima de un delito sexual a manos de los acusados— luego de decretadas las convicciones y de haberse dictado sentencia, se retracta de su testimonio judicial y, posteriormente, niega la veracidad de su retractación y retoma su versión original inculpatoria.

Antes de considerar esta cuestión, sin embargo, debemos atender otro aspecto de este caso.

## II

Tenemos consolidados ante nos tanto un recurso de apelación, como una solicitud de *certiorari*, presentados ambos por los apelantes peticionarios. Consideremos primero la apelación.

El complicado trámite procesal de este caso tiene su génesis el 8 de septiembre de 1989 con la declaración jurada de la menor E.G.R., que sirvió de base para determinar causa probable para el arresto. En ésta, la joven de trece (13) años de edad narró cómo los apelantes peticionarios alegadamente la violaron y sodomizaron en varias ocasiones en la Funeraria Jayuya Memorial (en adelante la funeraria), negocio que éstos poseían y operaban en el municipio de Jayuya. En ese momento, E.G.R. vivía en Jayuya en compañía de su madre, su padrastro y sus dos medio hermanos, de 3 y 5 años de edad, respectivamente.

Ese mismo día, tomando como base dicha declaración, el Ministerio Público presentó tres acusaciones contra Cruz Chévere Heredia, una por el delito de violación técnica,[1] "en o para uno de los días del mes de junio de 1989", y dos por el delito de sodomía,[2] "en o para uno de los días del mes de junio de 1989" y "allá en o para el día 31 de agosto de 1989". Presentó, además, tres acusaciones contra Ángel M. Chévere Rivera, hijo de Cruz Chévere, por los delitos de violación técnica, sodomía e infracción a los Arts. 6 y 7 de la Ley de Armas de Puerto Rico.[3] Contra este último, también se presentaron dos cargos adicionales por el delito de actos lascivos o impúdicos,[4] alegadamente cometidos contra J.R.S., otra menor, de quince (15) años de edad, quien

---

[1] Art. 99(a) del Código Penal de Puerto Rico, 33 L.P.R.A. sec. 4061(a).

[2] Art. 103(a) del Código Penal de Puerto Rico, 33 L.P.R.A. sec. 4065(a).

[3] 25 L.P.R.A. secs. 416–417.

[4] Art. 105(a) del Código Penal de Puerto Rico, 33 L.P.R.A. sec. 4067(a).

lo denunció una vez conoció de la imputación previa hecha por E.G.R.

A raíz de esto, el padre de E.G.R., Manuel Garrido Mancini, con el propósito de proteger a su hija, la internó en el Colegio Ángeles Custodios de Río Piedras.

El 15 de febrero de 1990, en la vista preliminar celebrada en el Tribunal de Distrito, Sala de Utuado, E.G.R. alteró su testimonio y le imputó la comisión de los delitos a su padrastro, Miguel Ángel Mejías,[5] por lo que se determinó que no había causa probable en cada una de las acusaciones aludidas. A la luz de esta nueva declaración, el tribunal ordenó colocar a la menor bajo la custodia y protección de la Unidad de Protección a Testigos del Departamento de Justicia. Ello no obstante, en violación a dicha orden, la niña fue entregada a su tío materno, el Policía Arnaldo Ríos Rivera, quien a su vez la envió a la residencia de su hermana Laura Ríos Rivera, también hermana de la madre de E.G.R., en el mismo pueblo de Jayuya, lugar donde la menor residió por varios meses.

El Ministerio Público acudió en alzada. Celebrada la correspondiente vista preliminar el 2 de mayo de 1990 en el Tribunal Superior, Sala de Utuado, se determinó causa probable en todos los casos, luego de que en dicha vista E.G.R. retomó su versión inicial de los hechos.

Las causas se ventilaron en conjunto ante un tribunal de derecho. El juicio se extendió del 26 al 30 de noviembre de 1990. Una vez finalizado, el mismo 30 de noviembre, Cruz Chévere fue encontrado culpable de un cargo de violación técnica y uno de sodomía. Sin embargo, el tribunal lo absolvió en el otro cargo por sodomía, puesto que la acusación le imputaba la comisión del delito el 31 de agosto de 1989, fecha en que el acusado efectivamente demostró

---

[5] E.G.R. manifestó en corte abierta que en cierta ocasión, cuando ella se encontraba en la casa, mientras su madre estaba fuera tendiendo ropa, su padrastro la tiró en la cama de su madre, donde la sodomizó primero y después la violó.

—mediante defensa de coartada— que se encontraba en una convención en el Hotel Sands en San Juan.

A Ángel Chévere se le encontró culpable de todos y cada uno de los delitos imputados.

El 10 de enero de 1991, se dictó sentencia que le imponía a Cruz Chévere la pena de reclusión de 50 años por el delito de violación técnica y 20 años por el de sodomía. A Ángel Chévere se le condenó a 50 años por cada uno de los dos cargos de violación técnica, 20 años por sodomía, 3 y 2 años por infracción a los Arts. 6 y 7 de la Ley de Armas de Puerto Rico, 25 L.P.R.A. secs. 416 y 417, respectivamente, y 8 años por cada delito de actos lascivos o impúdicos. En ambos casos, las penas se impusieron con agravantes, para ser cumplidas consecutivamente.

De dicha determinación, los acusados solicitaron reconsideración oportunamente. Ésta estuvo predicada sobre los tres fundamentos siguientes:

1) Que la prueba no fue sostenida al comprobarse que la supuesta perjudicada es una persona que miente en forma compulsiva y habitual desde su niñez hasta el presente, calificada por su propia madre como fantasiosa;
2) que la menor no permitió que se le realizara un examen completo de sus partes íntimas, necesario para corroborar su versión de encuentros frecuentes e intensos de sodomía, pretendiendo así que sus alegaciones sean aceptadas sin los correspondientes exámenes comprobatorios; y
3) que los hallazgos del médico no concordaban con la prueba.

Alegaron que todo lo anterior abonaba a la existencia de duda razonable. El tribunal de instancia denegó la moción de reconsideración.

Inconformes, el 18 de enero de 1991 los Chévere presentaron un escrito de *apelación* ante nos, para imputarle al foro a quo error: (1) "al dictar sentencias basadas en testimonios increíbles, inconsistentes e insuficientes"; (2) al denegar la moción de reconsideración, y (3) al dictar las sentencias con agravantes y consecutivas entre sí.

Estando aún pendiente de perfeccionarse dicho recurso

de apelación, el 3 de abril de 1991 Cruz Chévere presentó ante el foro de instancia su primera moción de nuevo juicio bajo la Regla 192 de Procedimiento Criminal, *supra*, acompañada de una declaración jurada de Garrido Mancini, padre de E.G.R. —20 de marzo de 1991, cuatro (4) meses después del juicio— en la cual éste afirmaba que su hija en cierta ocasión le había manifestado que el convicto peticionario Cruz Chévere era inocente. Explicaba Garrido Mancini, en su declaración, que antes de celebrarse la vista preliminar en alzada la fiscal a cargo del caso requirió que la menor se sometiera a la prueba del polígrafo; que en tres ocasiones llevó a su hija a realizarse dicha prueba, pero ésta se negó; que luego de negarse por tercera vez, él le exigió una explicación sobre su oposición recurrente a realizarse la prueba, recibiendo como respuesta que todo era una mentira; que su hija le aseguró que el acusado no "la había tocado ni amenazado", que había involucrado a Cruz Chévere porque estaba enamorada de su hijo Ángel, quien la había engañado, y que por esa razón "no le importaba meter preso al pai [sic], la mai [sic] y la familia entera de [Ángel]".

El tribunal se declaró sin jurisdicción para atender dicha moción, debido a que la sentencia impugnada ya era objeto de un recurso de apelación ante nos. Posteriormente, a solicitud de la representación legal de los acusados, paralizamos el procedimiento apelativo y ordenamos que se devolvieran los autos originales a instancia para que el foro sentenciador considerara la referida moción de nuevo juicio. Así autorizado, el 26 de abril de 1991 el tribunal de instancia celebró la vista correspondiente, escuchó los argumentos de las partes y les concedió un término para someter sendos memorandos de derecho. Así lo hicieron las partes, por lo cual quedó sometida la moción al amparo de la citada Regla 192 de Procedimiento Criminal el día 1ro de julio de 1991.

El 9 de septiembre de 1991, el tribunal denegó la moción de nuevo juicio de 3 de abril de 1991. Determinó que la nueva evidencia, consistente de la declaración jurada de Garrido Mancini, la cual repetiría en un nuevo juicio, era prueba impugnatoria tanto del testimonio judicial de su hija E.G.R., como del testimonio de los peritos. Señaló, además, que si bien dicha declaración pudo haber sido de utilidad para la defensa de los acusados, ésta no hubiese producido su absolución, ya que "[e]l testimonio de la perjudicada, [al que le dimos credibilidad, fue] contundente que no puede ser derrotado por [dicha] declaración ..., aún mirándolo con cautela. La testigo pudo narrar datos de la vida de los convictos, de su trabajo, así como de sus pertenencias. Además, dicho testimonio ... fue corroborado por los testigos del Ministerio Público".

Habiendo sometido las partes sus alegatos, con el beneficio de los autos originales y la voluminosa exposición narrativa de la prueba, procedemos a resolver la apelación.

### III

Como tenemos ante nos tanto un recurso de apelación como uno de *certiorari* relativo a una segunda moción de nuevo juicio, respecto a la cual se celebró una vista y se desfiló prueba, de entrada, es menester señalar que —a los fines de resolver lo planteado en la *apelación* contra las sentencias dictadas el 10 de enero de 1991— hemos de considerar únicamente la prueba que tuvo ante sí el tribunal sentenciador durante el juicio. No podemos tomar en cuenta la prueba ofrecida en apoyo a la segunda solicitud de nuevo juicio, que examinaremos por separado más adelante, al considerar la petición de *certiorari*. *Pueblo v. Morales Suárez*, 117 D.P.R. 497, 502 (1986). Aclarado este extremo, pasemos a considerar la apelación.

A. Los apelantes plantean, en cuanto a las convicciones

en sí, que en el caso relacionado a E.G.R. incidió el foro de instancia al condenarlos con prueba insuficiente en derecho y al permitir que los peritos, en particular a la doctora González de Knudson, opinaran sobre la credibilidad de los testigos. En el caso relacionado con J.R.S., se le imputa error al tribunal sentenciador al darle crédito al "testimonio inverosímil y no corroborado" de ésta.([6])

Luego de un detenido y minucioso examen de la extensa exposición narrativa de la prueba presentada en el caso de marras, resolvemos que la evidencia desfilada en el juicio —la cual fue creída por el juzgador de los hechos— fue suficiente en derecho para sostener las convicciones decretadas contra los apelantes.

En el juicio, la prueba de cargo en los casos relacionados con E.G.R. descansó mayormente en el testimonio directo de la principal testigo de cargo, la menor perjudicada E.G.R., y en el de la Dra. Doris González de Knudson, terapista de niños en el Centro de Ayuda a Víctimas de Violación.

E.G.R. declaró que conoció a Ángel Chévere —de 30 años de edad— en un entierro en Jayuya, cuando él se le acercó, le echó los brazos y le dijo "con permiso mi amor" para pasar por donde ella estaba; luego le tiró una guiñada. Como una semana más tarde, mientras ella estaba parada en la acera esperando la guagua escolar, él se detuvo en su vehículo y le pidió que lo acompañara a Ponce. Ella se negó, por lo que él la amenazó, mostrándole un revólver que tenía en el tobillo izquierdo. Por temor, ella subió al vehículo y se dirigieron al Hospital de Distrito de Ponce a recoger un cadáver. Describió el lugar donde se recogen los cadáveres y dijo que, después de ese día, nunca había regresado a dicho lugar.

---

([6]) En la apelación presentada el 18 de enero de 1991, los apelantes le imputaron error al foro de instancia "al denegar las mociones de reconsideración". Sin embargo, en el alegato presentado por los apelantes no se discute este señalamiento de error.

Continuó declarando que, cuando llegaron a Jayuya, fueron directo a la funeraria. Describió el cuarto de embalsamamiento y explicó cómo embalsaman los muertos. Manifestó que, una vez allí, el acusado Ángel Chévere la violó por primera vez, que le dolió y que sangró. Para ese entonces ella cursaba el sexto grado. También manifestó que, en otra ocasión, ella salía de la escuela cuando él pasó en su automóvil y le dijo que fuera a la funeraria. Ella fue y nuevamente él la violó y sodomizó.

Siguió declarando que otro día Cruz Chévere —de 65 años de edad— la estaba esperando en la acera frente a la casa de su tía y que, cuando ella salió, la llamó por su nombre y le dijo que quería tener relaciones con ella, a lo que ella se negó, y que él le dijo "pues si lo hiciste con mi hijo, lo vas a tener conmigo". Cuando llegó a la funeraria, estaban allí padre e hijo. Contó que Cruz Chévere le dio $10 a Ángel para que fuera a comprar pastillas anticonceptivas. Éste así lo hizo, y cuando llegó, le dieron una pastilla para que se la tomara y esperaron media hora, luego de lo cual Cruz Chévere la violó y sodomizó.

Narró que en cierta ocasión la metieron en un ataúd porque se acercaba la esposa de Ángel. También acusó a Ángel Chévere de cometer necrofilia con los cadáveres de tres señoras, mientras la obligaba a ella a observar. Testificó que, en otra ocasión, Ángel se la llevó para su casa y sostuvieron relaciones sexuales allí. Indicó que fue en cuatro ocasiones a la casa de éste y describió el interior de dicha residencia.

Señaló que un día decidió contárselo todo a su vecina Nereida Álvarez, quien posteriormente la llevó a un laboratorio clínico a hacerse una prueba de embarazo, que resultó negativa, y quien finalmente informó a la madre de E.G.R. lo que estaba sucediendo. La madre de E.G.R., a su vez, "se puso en vela", hasta que un día encontró a E.G.R. en la puerta de la funeraria, la recogió y decidió entonces acusar a Ángel y Cruz Chévere.

La menor testificó, además, que luego de que ella prestó la declaración jurada para acusar a los Chévere, la internaron en el Colegio Ángeles Custodios (en adelante el Colegio). Hasta allí llegó Adaliz, la esposa de Ángel, quien haciéndose pasar por su tía, la recogió y la llevó a un vehículo donde estaban los dos acusados. Dijo que en esa ocasión le entregaron una carta donde se exoneraba a los acusados y la instruyeron para que la pasara en su puño y letra y se la enviara a Adaliz a vuelta de correo. De ahí se fueron al Paseo de Diego en Río Piedras. Una vez ella regresó al Colegio, hizo exactamente lo que le indicaron.

La testigo también declaró que en otra ocasión Adaliz, Ángel, Cruz, Nereida Rivera —esposa del acusado Cruz Chévere— y el abogado de los acusados, la recogieron nuevamente en el Colegio. Dijo que la llevaron al Viejo San Juan a un espiritista. Después de ese día, continuaron comunicándose; manifestó que hizo once llamadas desde el Colegio a la funeraria y a la casa de Ángel; que la instruyeron sobre lo que tenía que decir en la vista preliminar y que así lo hizo. Durante el examen directo identificó a ambos acusados.

En el contrainterrogatorio manifestó que cuando fueron al Hospital de Ponce, a Ángel Chévere le entregaron un cadáver, sin estar presente ningún familiar de éste ni nadie que lo identificara; que la primera vez que Ángel la violó en la funeraria al regresar de Ponce, lo hizo con el arma de fuego puesta en el tobillo izquierdo; que tuvo relaciones con ambos acusados casi todos los días, algunas veces con uno por la mañana y con otro por la tarde, y que el último día, en que Cruz Chévere la violó, fue el 31 de agosto de 1989.

Aseguró no estar enamorada de ninguno de los acusados y explicó que iba a la funeraria porque se sentía amenazada. Le mostraron una carta que ella admitió haber escrito y que leía así: "la esposa de Chévere es [E.G.R.], yo lo amo, lo adoro, lo amo, lo quiero … los quiero los, adoro

mucho". Indicó que al escribir eso se refería a los acusados. La defensa le mostró otra carta que leía: "Angel y [E.G.R.] se aman, se adoran, se quieren, me gustan los ojos, me gusta el pecho, la cara, la boca, todo el cuerpo y su forma de ser". Le mostraron una tercera carta que decía: "Angel y [E.G.R.], Cruz Chévere y [E.G.R.] se aman". Ella explicó que escribió esas cartas porque los acusados le decían cosas "color rosa", como que le pondrían guardaespaldas y que traspasarían la mueblería que los acusados poseían en el pueblo a nombre de ella. A preguntas de la defensa, contestó que quería los guardaespaldas para que la protegieran de su madre y de su padrastro, "para que no le fueran hacer nada cuando se enteraran".

La defensa confrontó a la testigo con dos manifestaciones anteriores que ésta le había hecho a unos trabajadores sociales y que resultaron no ser ciertas. En una ocasión, la testigo le dijo a la trabajadora social de la escuela que un hombre negro la había perseguido con un arma hasta debajo de un puente y le había pedido que se quitara la ropa, pero que ella le dio una patada en los genitales y logró escapar. En la otra manifestación, inventó un viaje a Disney World.

La testigo indicó finalmente que fue a la funeraria, desde el 5 de mayo hasta el 1ro de septiembre de 1989, a sostener relaciones sexuales con Ángel Chévere porque estaba bajo sus amenazas y que nunca le dijo nada a su mamá por el temor que le tenía al acusado.

La psicóloga González de Knudson testificó, en síntesis, que la menor efectivamente había sido violada y sodomizada y que fueron los acusados las personas que cometieron tales actos.

Otra perita de cargo, la doctora Rodríguez González, psicóloga clínica especializada en el área de psicología escolar, declaró que examinó a E.G.R. en su oficina privada. Manifestó que, a pesar de que la menor había arrojado un resultado bajo promedio en las pruebas para determinar su

coeficiente intelectual, es una joven que "se expresa bien, es articulada" y que ha llegado hasta 7mo grado. Declaró, además, que el resultado de las pruebas que le hizo a E.G.R. demostraba que la menor evidenciaba una condición de síndrome postraumático, que podría ser consecuencia de una agresión sexual. A preguntas de la defensa puntualizó que, en ocasiones, la víctima se identifica con su agresor, lo que podría explicar las cartas que escribió E.G.R. y la acusación a otra persona.

Un tercer perito de cargo, el psicólogo clínico, Dr. Francisco Vergés Buisac, testificó, en esencia, que cuando examinó a la menor, ésta presentaba los síntomas típicos de niños y niñas que han sido abusados sexualmente.

Los restantes diez (10) testigos presentados por el Ministerio Público básicamente fortalecieron la versión de la menor, al confirmar ciertos detalles del testimonio de ésta y narrar las cosas que la menor les había relatado a ellos.([7])

Terminado el Ministerio Público, la defensa presentó su prueba que consistía de las declaraciones de diez (10) testigos. Cinco (5) de ellos se presentaron como defensa de coartada para demostrar que el 31 de agosto de 1989, Cruz Chévere se encontraba en San Juan, por lo que resultaba imposible que hubiese sodomizado a E.G.R. ese día, como

---

([7]) Nereida Álvarez Rosa, casada con el hermano del padrastro de E.G.R., fue la primera persona a quien la menor le contó los hechos y quien posteriormente informó de lo sucedido a la madre de la niña; Eloísa Ríos Rivera, madre de E.G.R.; Laura Ríos Rivera, tía de E.G.R., y con quien la niña estuvo viviendo unos meses; Marvy Rodríguez Carbia, dueña del laboratorio clínico donde se le realizaron a E.G.R. dos pruebas de embarazo y una de sífilis; Néstor Concepción Tavárez, investigador de la Puerto Rico Telephone Company, quien manifestó que del Colegio donde estaba la menor se realizaron 8 llamadas con cargo a la funeraria en Jayuya; María Aranzazú Labak, monja encargada de la casita donde vivía E.G.R. en el Colegio Ángeles Custodios, quien identificó a Adaliz como la persona que fue al Colegio a recoger a E.G.R. haciéndose pasar por una tía de la menor; María I. Ortiz Valdés, también hermana de la caridad en el mismo Colegio; Giovanni González González, doctor en medicina, primero en evaluar físicamente a E.G.R. y quien manifestó que el himen de la menor no estaba intacto, pero que no pudo realizarle el examen completo a ésta porque ella no lo permitió; Sandra Cruz Maldonado, agente de la Unidad de Delitos Sexuales en Ponce y quien investigó el caso en primera instancia, y Luis A. López, Director de la escuela donde E.G.R. estudió hasta sexto grado.

se le imputaba en una de las acusaciones en su contra. (Como antes indicáramos, el tribunal creyó esta prueba y absolvió al acusado de ese cargo en particular.)

Los restantes testigos de defensa se utilizaron para impugnar el testimonio de E.G.R., en un intento de probar que la menor perjudicada era una joven fantasiosa que se imaginó o inventó los hechos alegados.[8]

. ▮ Como puede observarse, la prueba desfilada, de ser creída como fue, versa sobre todos y cada uno de los elementos exigidos por nuestro ordenamiento penal para configurar los delitos de violación técnica, sodomía e infracción a la Ley de Armas de Puerto Rico. En particular, cabe destacar que lo verdaderamente medular entre los elementos del delito de violación técnica es el acceso carnal con una menor de catorce (14) años, 33 L.P.R.A. sec. 4061(a); por lo que la forma como la relación sexual ocurrió y cualesquiera otros detalles —tales como si hubo violencia o no, si hubo consentimiento o no, y los sentimientos de la víctima hacia sus agresores— carecen de pertinencia para determinar la configuración de la conducta criminal. Véase *Pueblo v. Rivera Robles*, 121 D.P.R. 858 (1988).

▮ Reiteradamente hemos establecido que "la evidencia directa de un testigo que merezca entero crédito es prueba suficiente de cualquier hecho". *Pérez v. Acevedo Quiñones*, 100 D.P.R. 894, 899 (1972). Regla 10 de Evidencia, 32 L.P.R.A. Ap. IV. Por ello, el testimonio de la testigo principal, por sí solo, de ser creído, como fue, es suficiente en derecho para sostener el fallo condenatorio, aun cuando no fue un testimonio "perfecto". Es al juzgador de los hechos a quien le corresponde resolver la credibilidad de un

---

[8] Declararon el juez que presidió la vista preliminar, quien entrevistó a la menor en cámara; Hilda M. Grau, Directora de la escuela donde la menor estudió el 6to grado; Efraín Rivera, asistente de patólogo en el Hospital de Distrito de Ponce, quien manifestó que no se entrega ningún cadáver si no está presente un familiar de éste; Wilfredo Nieves, trabajador social en la misma escuela; Bienvenido Rivera Andújar, embalsamador, y el Policía Arnaldo Ríos Rivera, tío de E.G.R.

testigo cuando haya partes de su testimonio que no sean aceptables, *Pueblo v. Cruz Negrón*, 104 D.P.R. 881 (1976); *Pueblo v. Cabán Torres*, 117 D.P.R. 645 (1986).(⁹) Aquí el juzgador de los hechos no sólo le creyó a E.G.R. la parte esencial de su testimonio, sino que, además, expresamente determinó que éste había sido "contundente".

■ Luego de dirimir credibilidad y aquilatar la evidencia desfilada y admitida en juicio, el foro sentenciador encontró culpables a los acusados. Coincidimos con el Ministerio Público en que no hay razón alguna para intervenir con la discreción del juez sentenciador al darle crédito en ese momento al testimonio de E.G.R. De ordinario, el tribunal de instancia está en mejor posición que un tribunal apelativo para aquilatar la prueba testifical porque pudo observar la manera como los testigos se expresaron y su comportamiento en la silla testifical (*demeanor*). En ese sentido, en *Pueblo v. Rivera Robles*, supra, pág. 869, caso que trataba precisamente sobre una violación técnica, expresamos, que

[l]a regla de deferencia hacia los juzgadores de instancia cobra mayor significado en casos de esta naturaleza, en que la forma de hablar, comportamiento, explicaciones, gestos, ademanes y demás detalles perceptibles, resultan esenciales para aquilatar adecuadamente la sinceridad de los testimonios. *Ortiz v. Cruz Pabón*, 103 D.P.R. 939, 947 (1975).

Ausente de indicios de pasión, prejuicio, parcialidad o error manifiesto, este Tribunal no intervendrá con la apreciación de la prueba que haya hecho el juzgador de instancia. *Pueblo v. Rodríguez Román*, 128 D.P.R. 121 (1991); *Pueblo v. Acabá Raíces*, 118 D.P.R. 369 (1987); *Pueblo v. Borrero Robles*, 113 D.P.R. 387 (1982); *Pueblo v. Millán Meléndez*, 110 D.P.R. 171 (1980); *Pueblo v. López Pé-*

---

(⁹) Sabido es que la falta de veracidad en parte de un testimonio no significa que deba descartarse absolutamente el resto de la declaración. *Pueblo v. López Rivera*, 102 D.P.R. 359 (1974); *Pueblo v. Feliciano Hernández*, 113 D.P.R. 371 (1982); *Pueblo v. Rodríguez Román*, 128 D.P.R. 121 (1991).

*rez*, 106 D.P.R. 584 (1977); *Pueblo v. Vázquez López*, 98 D.P.R. 15 (1969).

■ B. En cuanto al error imputádole al tribunal de instancia, por permitir la opinión de los peritos sobre la credibilidad de los testigos, los apelantes señalan que *no objetaron* al testimonio "altamente perjudicial e inadmisible de la perito doctora Knudson", porque aún no contaban con el beneficio de *Pueblo v. Canino Ortiz*, 134 D.P.R. 796 (1993). En este caso resolvimos que un perito debidamente cualificado puede emitir su opinión o impresión diagnóstica sobre si el menor ha sido víctima o no de abuso sexual, siempre y cuando no opine directamente respecto a la veracidad de la versión del menor o sobre la confiabilidad de su testimonio. Señalan también los apelantes que este es el tipo de error perjudicial que, bajo la Regla 6 de Evidencia, 32 L.P.R.A. Ap. IV, amerita la revocación de la sentencia. Examinemos este segundo planteamiento.

La doctora González de Knudson entrevistó a E.G.R. en 5 ó 6 ocasiones durante los meses de julio a septiembre de 1990. Con base a dichas entrevistas, esta perita declaró durante el juicio que los hechos narrados por la menor eran ciertos, y aseguró que "en este caso no ha habido ningún incesto. ... Estamos hablando de abuso sexual donde sabemos quiénes fueron los victimizadores [sic]". Añadió que tanto Ángel como Cruz Chévere ejercieron poder y control sobre la niña, lo que explica las cartas que escribió y la acusación a su padrastro. Al final de su testimonio, la doctora enfatizó que fueron los acusados quienes cometieron los actos.[10]

A todas luces, el testimonio pericial aludido excedió los parámetros permisibles establecidos en *Pueblo v. Canino*

---

[10] La doctora González de Knudson expresó que E.G.R. "es una niña vulnerable, que la hacía la víctima ideal para estas dos personas que abusaron de ella". Añadió que acusó a su padrastro, porque le temía menos a éste que a los acusados. Finalmente, el abogado defensor le preguntó que, si la niña estuviera mintiendo, ¿qué razones ella daría para eso? La perita contestó que no partía de la premisa de que la niña mentía, que ella no podía decir que la niña mentía.

*Ortiz*, supra. Sin embargo, coincidimos con el Ministerio Público en que, en el caso de autos, el fundamento para objetar el testimonio pericial ya estaba al alcance de los abogados defensores, quienes *no objetaron —en ningún momento— el testimonio de la perita.* Pudieron haber planteado durante el juicio que el testimonio de la perita rebasaba lo permitido por las Reglas de Evidencia de Puerto Rico, particularmente la Regla 57 (32 L.P.R.A. Ap. IV), pero no lo hicieron. Es muy tarde para levantar el asunto en apelación. *Pueblo v. Pellot Pérez*, 121 D.P.R. 791 (1988); *Pueblo v. Luzón*, 113 D.P.R. 315 (1982). Lo que es más importante aún, no tratamos aquí con un error perjudicial que justifique la revocación de la sentencia, toda vez que ya hemos resuelto que el solo testimonio de la perjudicada E.G.R., de ser creído, como fue, es suficiente en derecho para sostener las convicciones decretadas. Ello es particularmente cierto en casos como éste, que se ventilan ante tribunal de derecho; no tenemos ante nos una situación en la cual la declaración de un perito pudiera haber constituido una influencia indebida sobre el Jurado. Nótese, otra vez, que el foro sentenciador, al denegar la moción de nuevo juicio que tuvo ante sí, señaló que "el testimonio de la perjudicada fue contundente". El error cometido, pues, no es tan sustancial que amerite revocar la convicción. *Pueblo v. Ruiz Bosch*, 127 D.P.R. 762 (1991); *Pueblo v. Martínez Solís*, 128 D.P.R. 135 (1991).

C. En cuanto al caso contra Ángel Chévere por el delito de actos lascivos o impúdicos, la única testigo que declaró fue la perjudicada J.R.S. Ésta manifestó que, en el mes de abril de 1989, ella caminaba por la acera frente a la funeraria cuando el acusado la llamó por su nombre, la agarró por un brazo y la llevó para adentro, donde le tocó "los senos y las partes" mientras la amenazaba con matar a su papá. Acto seguido, la joven describió el interior de la funeraria.

Continuó declarando que ella le indicó al acusado que tenía que irse, y él le permitió que se marchara, pero le exigió que regresara al día siguiente, amenazándola con matarla o matar a sù papá si no se presentaba. Manifestó que al día siguiente, por temor a la amenaza recibida, regresó a la funeraria. Señaló que en esta ocasión el acusado la llevó a un laboratorio que hay dentro de la funeraria, el que describió; que la tiró en un colchón que había en el piso mientras él permanecía de pie porque no lograba desabrocharse el pantalón, y que ella aprovechó esa situación para salir corriendo del lugar.

Dijo que no había regresado a la funeraria hasta junio de 1989, cuando recibió una llamada telefónica del acusado mientras ella trabajaba en la Biblioteca Pública de Jayuya. Atestó que nuevamente, por temor a las amenazas proferidas por éste, ella fue a la funeraria pero que esa vez, cuando él la conducía hacia la parte de atrás, ella logró zafarse, corrió y pudo escapar. Añadió que, después de eso, él continuó persiguiéndola, pasaba por la escuela, la buscaba y le hacía señas desde lejos. Explicó entonces que un sábado leyó en el periódico lo que el acusado le había hecho a E.G.R., a quien dijo no conocer. La noticia indicaba que el acusado estaba preso, por lo que el lunes siguiente decidió ir a la Policía a denunciarlo. J.R.S. identificó al acusado en sala.

Durante el contrainterrogatorio, la menor repitió básicamente la misma historia. El Pueblo renunció al resto de los testigos y los puso a disposición de la defensa quien no los utilizó. No se presentó prueba de defensa y, así, el caso quedó sometido.

 Es evidente que el testimonio de J.R.S. le mereció credibilidad al tribunal de instancia,[11] y que dicho testi-

---

[11] Huelga aclarar, además, que hace quince años que en *Com. de la Mujer v. Srio. de Justicia*, 109 D.P.R. 715 (1980), declaramos inconstitucional lo dispuesto en la Regla 154 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, que requería que el

monio era suficiente para sostener su fallo. Sabido es, además, que el hecho de que un testigo incurra en contradicciones en torno a detalles de los hechos no es óbice para que no se le dé crédito a su testimonio, cuando nada increíble o improbable surge de éste. *Pueblo v. Arroyo Núñez*, 99 D.P.R. 842 (1971). En el caso de marras, con excepción de mínimas contradicciones insustanciales, nada hay en el testimonio de la niña que sea increíble o inverosímil a tal extremo que haya que descartarlo completamente. Tampoco hay muestra de que el tribunal sentenciador haya errado al creerlo ni que hubiese mediado prejuicio o parcialidad en su apreciación de dicho testimonio. No procede, pues, que intervengamos con la sentencia apelada en este particular. *Pueblo v. Falú Martínez*, 116 D.P.R. 828 (1986); *Pueblo v. Pagán Díaz*, 111 D.P.R. 608 (1981); *Pueblo v. Díaz Ríos*, 107 D.P.R. 140 (1978); *Pueblo v. Nevárez Virella*, 101 D.P.R. 11 (1973); *Pueblo v. Rodríguez Hernández*, 91 D.P.R. 183 (1964); *Pueblo v. Rodríguez Ocaña*, 88 D.P.R. 335 (1963).

D. En su apelación, los convictos alegan también que la pena de 50 años de reclusión impuesta por el tribunal por el delito de violación técnica es incorrecta en derecho; que la pena máxima para el delito referido es de 25 años. Tienen razón. El Ministerio Público se ha allanado a su planteamiento. La acusación imputaba el delito de violación técnica, inciso (a) del Art. 99 del Código Penal, 33 L.P.R.A. sec. 4061(a), para el cual se dispone una pena máxima de 25 años, y no el correspondiente al inciso (c), para el cual se dispone la pena máxima impuesta por el tribunal a quo. Por ello, las sentencias en cuestión deben modificarse, y reducir a 25 años de reclusión las penas impuestas en cada una, por la comisión de dicho delito.

También cuestionan los apelantes la imposición de las sentencias de forma consecutiva. Alegan que el tribunal

---

testimonio de la mujer perjudicada en los procesos por violación o tentativas por cometerlo fuera corroborado.

sentenciador abusó de su discreción al utilizar factores ajenos a los hechos del caso para agravar la pena. Se refieren a las manifestaciones que hizo el juez al momento de dictar sentencia contra Cruz Chévere y que reproducimos, en parte, a continuación:

> ... [S]inceramente me siento bien defraudado con usted. Usted y yo pertenecemos a una orden que nos obliga a actuar de una moral ... que requiere que seamos hombres libres y justos y usted traicionó esto. Pensando en la formación nuestra como masones y le digo que estamos obligados a protegernos unos a los otros, usted es mi hermano, hasta hoy, usted no se merece ningún tipo de consideración.

Argumentan los apelantes que el magistrado abusó de su discreción al imponer las sentencias consecutivas y que "si el acusado hubiera admitido su culpa y él o el Juez no hubieran sido hermanos masones, las sentencias hubieran sido concurrentes".

Sobre la determinación del modo de cumplir el convicto con los términos de prisión —si concurrente o consecutivamente— hemos sostenido que descansa en la sana discreción del tribunal sentenciador, *Pueblo v. Torres Rivera*, supra; ello no constituye castigo cruel e inusitado si el juzgador tomó en consideración la naturaleza de los delitos y el hecho de que las penas decretadas están dentro de los límites fijados por el estatuto correspondiente. E. Chiesa Aponte, *Derecho procesal penal de Puerto Rico y Estados Unidos*, Colombia, Ed. Forum, 1993, Vol. III, pág. 561. Véanse: *Pueblo v. Hernández Mercado*, 126 D.P.R. 427 (1990); *Pueblo v. Burgos Hernández*, 113 D.P.R. 834 (1983); *Pueblo v. González*, 97 D.P.R. 541 (1969); *Pueblo v. Matos Pretto*, 93 D.P.R. 113 (1966); Regla 179 de Procedimiento Criminal, 34 L.P.R.A. Ap. II. No obstante lo anterior, podemos intervenir con el ejercicio de esa discreción cuando en dicha determinación haya mediado pasión, prejuicio, parcialidad o mal juicio. *Pueblo v. Pagán, Ortiz*, 130 D.P.R. 470 (1992).

En el caso que nos ocupa, desaprobamos las antes citadas expresiones del juez sentenciador. Éstas denotan motivaciones extrañas al proceso y tienden a indicar que efectivamente, al momento de ejercer su discreción, el hecho de compartir la condición de masón con el acusado pesó significativamente en el ánimo del juez sentenciador, quien, debido a lo anterior, impuso una consecuencia penal tan grave como la de ordenar el cumplimiento de las sentencias de forma consecutiva. Concluimos que el tribunal de instancia abusó de su discreción al imponer las penas para ser cumplidas de forma consecutiva.

En consecuencia, resolvemos que Cruz Chévere deberá cumplir la pena de 25 años por el delito de violación técnica y la de 20 años por el de sodomía de modo concurrente. Así mismo, Ángel Chévere deberá cumplir, en el caso relacionado a E.G.R., las penas de 25 años por cada uno de los dos cargos de violación técnica, la de 20 años por el delito de sodomía y las de 3 y 2 años por las infracciones a la Ley de Armas de Puerto Rico de manera concurrente. La penas impuestas contra Ángel Chévere en el caso relacionado a J.R.S. se deberán cumplir también de manera concurrente, pero consecutivas a las anteriores, impuestas en el caso relacionado a E.G.R.

E. Finalmente, los apelantes alegaron que el tribunal sentenciador cometió un error al denegar la moción de nuevo juicio presentada por éstos el 3 de abril de 1991, basada en la aparición de nueva prueba consistente en la declaración jurada del padre de E.G.R.

La Regla 188 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, regula la concesión de un nuevo juicio por alegada aparición de nueva evidencia. Dicha regla señala, en lo pertinente, lo siguiente:

> El tribunal concederá nuevo juicio por cualquiera de los siguientes fundamentos:
> (a) Que se ha descubierto nueva prueba, la cual, de haber sido presentada en el juicio, probablemente habría cambiado el

veredicto o fallo del tribunal, y la que no pudo el acusado con razonable diligencia descubrir y presentar en el juicio.

La citada Regla 192 de Procedimiento Criminal añade otro fundamento para la concesión de un nuevo juicio:

> También podrá el tribunal, a solicitud del acusado, conceder un nuevo juicio cuando después de dictada la sentencia sobreviniere el conocimiento de nuevos hechos o de nuevos elementos de prueba de tal naturaleza que evidencien la inocencia del condenado.

■ A modo de interpretación de dichas reglas, hemos esbozado la norma aplicable a esta clase de situación en *Pueblo v. Martínez Ortiz y otros*, 135 D.P.R. 100 (1994); *Pueblo v. Torres Rivera*, 129 D.P.R. 331 (1991); *Pueblo v. Morales Rivera*, 115 D.P.R. 107 (1984); *Pueblo v. González de Demora*, 92 D.P.R. 75 (1965); *Pueblo v. Villalongo Torres*, 102 D.P.R. 574 (1974); *Pueblo v. Morales*, 66 D.P.R. 10 (1946); *Pueblo v. Beltrán*, 73 D.P.R. 509 (1952), entre otros. Establecimos que una moción de nuevo juicio, *fundada en el descubrimiento de nueva prueba*, con posterioridad al fallo o veredicto de culpabilidad, sólo procede cuando esta última: (1) no pudo descubrirse con razonable diligencia antes del juicio; (2) no es prueba meramente acumulativa; (3) no impugna la prueba aducida durante el juicio; (4) es de naturaleza creíble, y (5) probablemente produciría un resultado diferente.

■ También hemos expresado, en repetidas ocasiones, que la concesión de un nuevo juicio descansa en la sana discreción del tribunal sentenciador y que, denegada la referida moción por ese foro, este Tribunal no intervendrá con dicha determinación, a menos que se demuestre un claro e inequívoco abuso de esa discreción. *Pueblo v. Morales Rivera*, supra; *Pueblo v. Prieto Maysonet*, 103 D.P.R. 102 (1974); *Pueblo v. Agosto Castro*, 102 D.P.R. 441 (1974); *Pueblo v. Vázquez Izquierdo*, 96 D.P.R. 154 (1968); *Pueblo v. Pardo Toro*, 90 D.P.R. 635 (1964); *Pueblo v. Morales*, supra.

El tribunal sentenciador estimó que la moción basada en la declaración jurada de Garrido Mancini no procedía, puesto que dicha declaración constituía prueba impugnatoria del testimonio de E.G.R., testimonio que le pareció contundente, le mereció credibilidad y estuvo corroborado por el de los peritos y demás testigos del Ministerio Público.

Nos toca resolver si, conforme a los hechos particulares de este caso, el foro a quo abusó de su discreción o no al denegar esta primera solicitud de nuevo juicio que estaba fundada en el descubrimiento de supuesta nueva prueba.

Resolvemos que el tribunal no abusó de su discreción. Como hemos sostenido anteriormente:

> ... [N]o toda evidencia para impugnar la credibilidad de un testigo principal de cargo —no revelada al acusado durante el juicio y descubierta por éste con posterioridad a él— requiere automáticamente la concesión de un nuevo juicio. Se requiere determinar que tal evidencia es relevante, esto es, *que su supresión socava la confianza en el resultado del juicio.* (Énfasis suprimido y énfasis suplido.) *Pueblo v. Torres Rivera*, supra, pág. 351.

El tribunal de instancia estimó que la convicción de los apelantes estuvo "ampliamente sostenida por la evidencia presentada en juicio". Luego de examinar de forma acuciosa y detenida la exposición narrativa de la prueba, somos del criterio que el foro a quo no abusó de su discreción, toda vez que, aun tomando en cuenta la declaración de Garrido Mancini, el testimonio de la perjudicada no pierde fuerza ni desmerece su credibilidad. Dicha prueba, ciertamente, es de carácter impugnatorio, pues va dirigida a lesionar la credibilidad que la perjudicada le mereció al juzgador de los hechos. Al respecto, apuntó el foro a quo que "examinado el testimonio de la perjudicada y víctima, testimonio que se quiere impugnar por mendaz, concluimos que al mismo le dimos credibilidad". Como antes mencionáramos, se debe rechazar una solicitud de nuevo juicio

cuando la nueva prueba sea de carácter impugnatorio, como éste.

■ Sabido es, además, que el peso de la prueba para acreditar el cumplimiento de los requisitos antes enumerados lo tiene el promovente de la moción de un nuevo juicio. *United States v. Adamson*, 592 F.2d 907 (5to Cir. 1979); *United States v. Rocco*, 587 F.2d 144 (3er Cir. 1978). En este caso, los apelantes no han demostrado que en un nuevo juicio, de presentarse esa nueva evidencia, el tribunal llegaría a un resultado diferente.

En resumen, pues, la referida declaración jurada no cumple con varios de los requisitos que reiteradamente hemos exigido bajo las reglas pertinentes para que proceda la moción de un nuevo juicio.

Pasemos ahora a considerar la petición de *certiorari*.

### IV

A. El 9 de septiembre de 1991, estando pendiente ante nos la apelación presentada por los Chévere, dilucidada antes en esta opinión, los apelantes presentaron, ante el foro de instancia, una segunda moción de nuevo juicio al amparo de la Regla 192 de Procedimiento Criminal, *supra*. En esta ocasión, la moción estaba predicada en el contenido de una carta de E.G.R. que ésta le entregó a Nereida Rivera, esposa de Cruz Chévere y madre de Ángel Chévere, el 16 de agosto de 1991, meses después del juicio. La misiva, en síntesis, decía lo mismo que la otra carta que fue presentada durante el juicio, también escrita por E.G.R. a instancias de los Chévere y de Adaliz, la esposa de Ángel Chévere; discutida antes al considerar la apelación. En la segunda carta, E.G.R. volvía a señalar que los convictos no eran culpables. Aducía, además, que su padrastro y otros familiares le habían indicado que debía decir que los Chévere la habían violado. Terminaba señalando que "el grupito" la estaba vigilando constantemente, pero que a

pesar de sus amenazas ella iba a decir que ambos acusados eran inocentes.

La moción de nuevo juicio de 9 de septiembre también estaba basada en una tarjeta postal que la perjudicada le había enviado a Ángel Chévere a la Cárcel Regional de Ponce, donde fue ingresado luego del fallo condenatorio. En la tarjeta, escrita el 1ro de octubre de 1991, la menor le decía a Ángel que, aunque la tuvieran amenazada, iba a decir la verdad para que él y su padre quedaran libres.

Estando pendiente la referida moción de nuevo juicio, el 9 de octubre de 1991 los convictos presentaron en instancia un nuevo escrito en apoyo de la referida moción. Alegaron que el 1ro de octubre de 1991 habían tenido acceso a una grabación en la cual E.G.R. exoneraba a los acusados, a la vez que le hacía serias y graves imputaciones al juez que presidió los procesos y que consideraba las mociones sobre un nuevo juicio, relacionadas con supuestas actuaciones impropias de éste durante y después del juicio. En dicha grabación, la menor manifestaba, entre otras cosas, que durante el juicio la madre de la menor se comunicaba telefónicamente con el juez y visitaba la residencia de éste. También señalaba que, luego de decretadas las convicciones, el juez y su esposa pernoctaron en la casa de su madre y de su padrastro. A tenor con dicha declaración, alegaron los peticionarios que el juez que presidió el juicio no tenía una mente exenta de prejuicio, sino una predisposición y un compromiso con la familia de la perjudicada de dictar un fallo condenatorio y de "coronar con un NO HA LUGAR todo esfuerzo en obtener un nuevo juicio". Solicitaron el señalamiento de una vista para desfilar la prueba concerniente a dicha grabación, con citación expresa de E.G.R.

Por razones obvias, dicho juez se inhibió, motu proprio, de resolver esta moción y de seguir participando en el caso, por lo que éste se reasignó al Tribunal Superior, Sala de Arecibo.

Luego de diversos incidentes procesales, las vistas sobre la solicitud pendiente de un nuevo juicio se celebraron el 5 y 20 de diciembre de 1991,([12]) y el 16 y 27 de enero de 1992.

El 19 de mayo de 1992, previa solicitud, con la objeción del Estado y la celebración de la vista correspondiente, el tribunal de instancia emitió una resolución, mediante la cual le concedió a ambos acusados el beneficio de una fianza en apelación. El Procurador General acudió ante nos mediante un recurso de *certiorari*, que posteriormente denegamos, por lo que los convictos apelantes permanecen bajo fianza.

Finalmente, el 20 de abril de 1992 el foro de instancia emitió una extensa resolución escrita, mediante la cual declaró sin lugar la referida moción sobre un nuevo juicio. En dicha resolución, el foro a quo opinó que a su juicio los convictos habían sido sentenciados aun cuando existía duda razonable sobre su culpabilidad. Ello no obstante, denegó la solicitud de un nuevo juicio por entender que la nueva evidencia pudo haber sido descubierta con anterioridad al juicio.

No conformes con dicha resolución, los peticionarios oportunamente recurrieron al Tribunal de Apelaciones, Sección Sur, mediante la correspondiente solicitud de *certiorari*. El 23 de junio de 1993 el Tribunal de Apelaciones expidió el auto solicitado. Posteriormente, al cesar sus funciones, el expediente fue referido a este Tribunal para nuestra consideración.

En su recurso de *certiorari*, que ahora pasamos a considerar, los peticionarios convictos hacen los señalamientos de error siguientes:

1. ERRÓ EL TRIBUNAL AL RESOLVER QUE LA NUEVA

---

([12]) En el ínterin, el 10 de diciembre de 1991 el Ministerio Público solicitó una "Orden Protectora" en favor de E.G.R. para que el padre de la menor y el licenciado Díaz Collazo se abstuvieran de realizar gestión alguna conducente a conseguir la custodia de la menor.

EVIDENCIA PUDO SER DESCUBIERTA CON ANTERIORI-
DAD AL JUICIO.

2. ERRÓ EL TRIBUNAL AL DENEGAR LAS MOCIONES DE
NUEVO JUICIO A PESAR DE QUE DETERMINÓ COMO
CUESTIÓN DE HECHO QUE LA NUEVA PRUEBA ERA
CREÍBLE Y ESTAR CONVENCIDO DE LA INOCENCIA DE
LOS ACUSADOS-PETICIONARIOS.

3. ES ERRÓNEA LA DETERMINACIÓN DEL TRIBUNAL DE
QUE ESTABA ATADO POR LOS TECNICISMOS LEGALES.

4. ERRÓ EL TRIBUNAL EN SU INTERPRETACIÓN DE LOS
CRITERIOS A SEGUIR AL EVALUAR UNA MOCIÓN DE
NUEVO JUICIO.

B. El tribunal que resolvió la moción de nuevo juicio,
que está ante nos ahora, concluyó que no procedía celebrar
un nuevo juicio por no cumplirse con los requisitos legales
para ello. Ello no obstante, hizo constar que: "[a]l emitir
nuestra decisión nos sentimos atados por los tecnicismos
legales, aún cuando entendemos que *en justicia* procedería
la concesión de un nuevo juicio ... ante una duda más que
razonable sobre quién fue la persona que cometió tan vil
acto, no podemos cerrar nuestros ojos a una cruda reali-
dad: la culpabilidad de los convictos no se probó más allá
de toda duda razonable." (Énfasis suplido.)

Su determinación se basó en su examen de las referidas
tres piezas de supuesta "nueva prueba", que presentaron
los peticionarios, y en lo que declararon varios testigos
traídos por las partes en las vistas correspondientes. Con-
viene relatar brevemente la esencia de estos testimonios.

En la vista sobre un nuevo juicio, por la parte promo-
vente declararon la perjudicada, E.G.R.; Elvin Horta Ro-
dríguez, técnico de grabación; Manuel Garrido Mancini,
padre de E.G.R., y Sol Marie Garrido, hermana de un solo
vínculo de E.G.R. Por su lado, la parte promovida presentó
como testigos a la Lcda. Olga Longoria Vélez, abogada de
Servicios Legales de Puerto Rico, Inc., y a Eloísa Ríos, ma-
dre de E.G.R.

La primera testigo en declarar el 5 de diciembre de 1991 fue E.G.R. En dicha ocasión, cuando la menor iba a comenzar a testificar irrumpió en llanto, por lo que el tribunal se vio en la obligación de desalojar la sala y referir a la menor a la trabajadora social. Una vez reunida en cámara con el juez y la trabajadora social, la menor les expresó a éstos que deseaba que el abogado de la defensa que la había entrevistado en ocasiones anteriores, el licenciado Díaz Collazo, no estuviese en sala cuando ella declarase. El juez accedió a esta solicitud. Luego de dos recesos, una vez en la silla de los testigos y en la solemnidad del tribunal, la menor *volvió a retractarse y alteró nuevamente su versión de los hechos*, al señalar que escribió la postal y la carta porque se sentía intimidada por su padre biológico, por los familiares y por el abogado de los convictos. Declaró, además, que nada de lo dicho en la grabación en cuestión era verdad, que ésta había sido interrumpida en varias ocasiones mientras repasaba lo que tenía que decir y que las alegaciones en contra de su padrastro tampoco eran ciertas. También negó la veracidad de lo que había manifestado sobre el juez que dirigió los procesos anteriores.

El 20 de diciembre, en la continuación de la vista, el técnico Horta Rodríguez explicó que fue él quien reprodujo la cinta de grabación, pasándola del *microcassette* original en el cual se grabó la conversación, a un *cassette* regular. Declaró que la cinta no había sido alterada, editada ni interrumpida. Aseguró que la única interrupción fue hecha para voltear el *cassette* una vez terminó el primer lado que usaron, para continuar grabando por el otro lado.

Ese mismo día, el padre de la niña, Garrido Mancini, declaró que estuvo presente cuando se tomó la grabación; que nadie amenazó a E.G.R. para que dijera lo que dijo; que ésta habló espontáneamente, y que sólo se encontraban allí E.G.R., el licenciado Díaz Collazo y su amigo Jorge Otero, su otra hija Sol Marie y él. También explicó que, cuando la menor cambió su versión original de los hechos

en la vista preliminar, él acudió a la fiscal que inicialmente intervino en el caso, y que ésta le manifestó que hasta tanto la menor no se sometiera a las pruebas del polígrafo, ella no continuaría con la investigación. Añadió que, en ocasión de acompañar a su hija por tercera vez a hacerse la prueba del polígrafo y ésta negarse, él la confrontó y ella le manifestó que Ángel Chévere la había engañado y por eso "si tenía que meter presa a toda su familia, lo haría". Continuó declarando que, a la luz de esta manifestación de la niña, él fue a la oficina del Fiscal e informó lo sucedido. Recibió como respuesta que ya el juez y los fiscales le habían creído a la niña; que se olvidara del asunto. Manifestó que no había dicho nada de esto antes del juicio porque confiaba en que E.G.R. declararía allí lo mismo que le había confesado a él, además de que no quería perjudicar a su hija.

El 16 de enero de 1992, la única testigo que declaró fue E.G.R., a quien los promoventes sentaron nuevamente en la silla de los testigos a los únicos efectos de que autenticara la cinta que contenía la grabación. Ella la escuchó en Sala y dijo que efectivamente esa era la grabación que había hecho, sin que se le añadiera ni se le quitara nada.

El 27 de enero de 1992, testificó por la defensa la menor Sol Marie Garrido, hija del segundo matrimonio de Garrido Mancini. Ésta declaró que estuvo presente el día de la grabación; que llegó al lugar de la grabación con su padre y con *el licenciado Díaz Collazo*, quien los había llevado allí; que, cuando llegaron a la mueblería de los Chévere, ya su hermana estaba allí esperándolos en el segundo piso; que nadie la amenazó ni se habló nada que no se grabara; y que las únicas personas presentes fueron E.G.R., su padre, el licenciado Díaz Collazo y Jorge Otero. Dijo que Nereida Rivera se encontraba en el primer piso de la mueblería.

Los restantes testigos anunciados fueron renunciados por ser prueba acumulativa y se pusieron a disposición del Fiscal, quien tampoco los utilizó.

Luego de un receso, el Ministerio Público sentó a la licenciada Longoria Vélez. Ésta declaró sobre una visita que recibió en su oficina, allá para el mes de octubre de 1991, cuando Garrido Mancini se presentó *con el licenciado Díaz Collazo* con la intención de que ella escuchara la aludida grabación y le concedieran la custodia de la niña al padre. Atestó que el Departamento de Servicios Sociales no tomó acción porque a ella la grabación no le merecía credibilidad.

Eloísa Ríos, por su parte, declaró únicamente a los efectos de desmentir las aseveraciones que su hija E.G.R. hacía en la grabación sobre su supuesta relación con el juez que presidió el juicio. Manifestó que éste nunca había visitado su residencia y que ella jamás había conversado con él.

Concluido otro receso, los promoventes presentaron como testigo de refutación a Luis Padín, un alguacil del tribunal. Éste declaró que durante el juicio, él observó a Eloísa Ríos conversando con el juez que presidía el proceso, durante un receso del tribunal, por un período aproximado de 20 minutos.

Así quedó sometida la moción de nuevo juicio en cuestión. El 20 de abril de 1992, el tribunal emitió su resolución en la que declaró sin lugar la solicitud de nuevo juicio. Estimó el foro a quo que, con excepción de la tarjeta postal, la prueba presentada por la defensa pudo haber sido descubierta con anterioridad al juicio, por lo que no se cumplía con uno de los requisitos esenciales para conceder el nuevo juicio.

C. Tenemos ante nos, por primera vez, una situación en la cual el principal testigo de cargo se retracta posteriormente de su testimonio judicial, y se alega que bajo la Regla 192 de Procedimiento Criminal, *supra*, ello constituye

nuevos hechos y nuevos elementos de prueba de tal naturaleza que evidencian la inocencia del acusado, por lo que el tribunal a quo debió ordenar un nuevo juicio.

 Nuestras reglas nada disponen que aplique específica y concretamente a la situación de testimonio retractado que tenemos ante nos ahora. Este Tribunal tampoco se ha expresado antes sobre el particular. Sin embargo, el asunto ha sido extensamente considerado en Estados Unidos, de donde proceden nuestras normas de procedimiento criminal. En la jurisdicción federal, los tribunales reiteradamente han resuelto, como principio general, que retractarse de un testimonio judicial es inherentemente sospechoso y, de ordinario, no constituye una base adecuada para la concesión de un nuevo juicio. Ello es particularmente cierto en casos en los cuales el testigo que se retracta es la propia víctima del crimen. *U.S. v. Gayles*, 1 F.3d 735 (8vo Cir. 1993); *U.S. v. Provost*, 969 F.2d 617 (8vo Cir. 1992); *U.S. v. Di Paolo*, 835 F.2d 46 (2do Cir. 1987); *Lindsey v. United States*, 368 F.2d 633 (9no Cir. 1966); *United States v. Ratley*, 284 F.2d 553 (2do Cir. 1960); *United States v. Ochs*, 548 F. Supp. 502 (D. N.Y. 1982). En efecto, no parece haber decisiones federales en las cuales la retractación de un testimonio judicial por una víctima haya sido considerada como base suficiente para conceder un nuevo juicio. T.A. Thomas, *Recantation of Testimony of Witness as Grounds for New Trial—Federal Criminal Cases*, 94 A.L.R. Fed 60 (1989).

La situación es similar en las jurisdicciones estatales norteamericanas. En éstas prevalece también la norma general de que retractarse es poco confiable y altamente sospechoso y que, de ordinario, no es base suficiente para conceder un nuevo juicio. W.R. Habeeb, *Recantation by Prosecuting Witness in Sex Crime as Ground for New Trial*, 51 A.L.R. 3d 907 (1973). En casos estatales, como el de marras, en los cuales la víctima de un delito sexual, y principal testigo de cargo, se retractó posteriormente de su tes-

timonio judicial, los tribunales de diversas jurisdicciones han denegado la solicitud de un nuevo juicio. *State v. Marcum*, 480 N.W.2d 545 (Wis. 1992); *State v. McDonald*, 602 A.2d 923 (R.I. 1992); *State v. Wright*, 598 So. 2d 561 (L. 1992); *State v. Kasten*, 823 P.2d 91 (Ariz. 1991); *State v. Culkin*, 791 S.W.2d 803 (Mo. 1990); *State v. Tharp*, 372 N.W.2d 280 (Iowa 1985); *Hancock v. State,* 664 P.2d 1039 (Okla. 1983); *People v. Ellison*, 411 N.E.2d 350 (Ill. 1980); *Johnson v. State*, 501 P.2d 762 (Alaska 1972); *Williams v. State*, 375 S.W.2d 449 (Tex. 1964); *People v. Langlois*, 220 Cal.App.2d 831 (Cal. 1963); *People v. Andrews*, 104 N.W.2d 199 (Mich. 1960).

Debe señalarse, además, que en las jurisdicciones norteamericanas se ha denegado casi invariablemente la moción de nuevo juicio cuando el testigo de cargo que se desdice *luego repudia su retractación y retoma su versión original*, como sucedió en el caso ante nos. En tales situaciones, la inmensa mayoría de los foros judiciales estatales y federales están contestes con que no procede el nuevo juicio. *O'Connor v. State*, 529 N.E.2d 331 (1988); *U.S. v. Santiago*, 837 F.2d 1545 (11mo Cir. 1988); *United States v. Radney*, 484 F. Supp. 1032 (D. Ala. 1980); *Weston v. State*, 351 So. 2d 75 (1977); *Lindsey v. United States*, supra, *cert.* denegado 386 U.S. 1025 (1967); *Commonwealth v. Russell*, 184 A.2d 149 (1962); *Hicks v. State*, 243 S.W.2d 372 (1951); *Adell v. State*, 211 S.W.2d 575 (1948); *State v. Wheat*, 207 N.W. 623 (1926).

La postura aludida de la mayoría de los tribunales federales y estatales de Estados Unidos responde a razones y motivos de mucho peso. Los foros judiciales desdeñan las retractaciones porque generalmente se hacen extrajudicialmente, al margen del ambiente solemne de un tribunal, a instancias de las partes interesadas y por testigos muy susceptibles a la intimidación o sugestión, dados a testimonios inconsistentes. La experiencia judicial es que dichas retractaciones son de ordinario muy poco confiables. Ade-

más, los tribunales se rehúsan a favorecer una actuación que pueda tener graves efectos adversos sobre la administración de la justicia criminal. Consideran que darle eficacia a las retractaciones tiende a socavar la confianza de la gente respecto a los juicios penales; puede dar lugar a la interminable relitigación de casos ya resueltos, y sobre todo, invitaría a testigos potenciales a no tomar en serio el deber que tienen de ser veraces. Véase S. Cobb, *Gary Dotson as Victim: The Legal Response to Recanting Testimony*, 35 Emory L.J. 969 (1986).

Todo lo anterior no obstante, existen unas pocas situaciones en las cuales los tribunales norteamericanos han concedido un nuevo juicio en casos de retractación de un testimonio judicial. En esencia, ello ha ocurrido cuando, a la luz de las circunstancias particulares del caso, el foro que dilucida la moción de nuevo juicio o su denegatoria, ha tenido graves dudas sobre la veracidad de lo declarado por el testigo *durante el juicio. Ledet v. U.S.*, 297 F.2d 737 (5to Cir. 1962); *U.S. v. Flynn*, 130 F. Supp. 412 (D. N.Y. 1955); *People v. Smallwood*, 10 N.W.2d 303 (1943); *Martin v. State*, 246 P. 647 (1926); *Solis v. State*, 262 So. 2d 9 (1972); *Commonwealth v. Mosteller*, 284 A.2d 786 (1971). Estas decisiones han sido acogidas con encomio por algunos comentaristas, quienes sostienen que la postura tradicional de los tribunales es muy rígida y puede dar lugar, en alguno que otro caso, a la encarcelación de personas inocentes. Cobb, *supra*, págs. 1001–1002 y 1008–1009.

Con estos criterios en mente, pasemos a examinar la situación que se ha traído a nuestra consideración en el caso de autos. En particular, debemos escudriñar las *circunstancias bajo las cuales ocurrió la retractación* en cuestión, a los fines de ponderar su valor probatorio. Thomas, *supra*, pág. 64; Cobb, *supra*, pág. 1009.

En primer lugar, debe notarse que en todas las piezas de supuesta nueva prueba, que evidencian la retractación de E.G.R., está ominosamente presente la mano de los propios

convictos, por diversos medios. Así pues: 1. La tarjeta postal fue escrita cuando estaba la testigo en la mueblería de los convictos, en ocasión de ella haber acudido allí para entrevistarse con el abogado de éstos, quien le dio dinero para comprar la tarjeta y colaboró en su redacción. 2. La grabación se hizo en los altos de la mueblería de los convictos, el mismo día que E.G.R. escribió la tarjeta postal. Dicha grabación fue realizada por el propio abogado de los convictos, quien posteriormente la llevó a un técnico para copiarla y así producir la grabación que se trajo ante el tribunal. La grabación contiene las expresiones de E.G.R. durante una conversación con el abogado de los convictos. 3. La carta escrita por E.G.R. estaba dirigida a la esposa de uno de los convictos y madre del otro. La menor testificó, sin que este testimonio fuese contradicho por persona alguna, que escribió dicha carta obligada por el cuñado de Ángel Chévere. Provoca sospecha, además, la última oración escrita en dicha carta, y que lee así:

> Bueno, Nereida, tu medises [sic] si esta carta esta [sic] vien [sic] cuando me vea [sic] por el pueblo, o si no te mando otra.

En segundo lugar, debe notarse que todas las instancias aludidas en las cuales E.G.R. desdice su testimonio judicial ocurrieron *extrajudicialmente*, fuera de la solemnidad del proceso judicial, sin la presencia del Ministerio Público o algún representante legal que protegiese a la perjudicada o que la contrainterrogara.

En tercer lugar, debe tenerse en cuenta que la propia testigo, en la vista judicial para considerar la moción de nuevo juicio, no sólo repudió su retractación, sino que, además, expresamente adujo que se había retractado porque se sentía amenazada por su padre, por sus familiares y por el abogado de los convictos.

Finalmente, debe tenerse en cuenta que E.G.R., al momento de la retractación, era aún una menor de quince (15) años de edad, a todas luces sumamente vulnerable y susceptible a intimidación o sugestión.

En vista de lo anterior, a la luz de la normativa antes reseñada sobre la retractación de testimonio judicial, procedería concluir que la retractación ante nos ahora es muy poco confiable y que no es base suficiente para ordenar la celebración de un nuevo juicio. Lo único que podría militar en contra de resolver de este modo es el señalamiento del juez que presidió las vistas para considerar la moción de nuevo juicio, a los efectos de que él entendía que "en justicia procedería la concesión de un nuevo juicio", pero que no lo hacía por sentirse "atado por los tecnicismos legales". Según dicho juez, su análisis de la prueba, ante él desfilada, tendía a demostrar que "la perjudicada en diferentes etapas del proceso no ha dicho toda la verdad", por lo que él tenía "una duda más que razonable" sobre quién abusó de la menor.

La postura del juez aludido, sin embargo, no es suficiente para justificar la concesión de un nuevo juicio. Nótese, en primer lugar, que el propio juez señaló en su resolución que no estaba haciendo "una determinación respecto a la veracidad o mendacidad de la menor", sino más bien abogando por que hubiese una oportunidad para que todas las partes pudiesen presentar toda la evidencia que tenían y así "aclarar las interrogantes surgidas a raíz del testimonio de la víctima".

En segundo lugar, el referido juez no sólo no tenía la función de adjudicar la credibilidad del testimonio vertido por E.G.R. *durante el juicio de los convictos*, sino que tampoco tenía base adecuada alguna para hacerlo. Él no presidió ni participó de ningún modo en el juicio; no tuvo ante sí la prueba que allí desfiló ni escuchó a la menor testificar entonces, en condiciones muy distintas a las del testimonio de ésta ante dicho juez. Como bien señaló, de modo expreso y claro, el propio magistrado aludido en su resolución denegatoria de un nuevo juicio: no es al juez que preside la vista sobre nuevo juicio, sino al tribunal que atienda la apelación, a quien le corresponde aquilatar el valor de la

prueba presentada en el juicio, que ya fue adjudicada por otro juzgador, al que le correspondía hacerlo.

En resumen, pues, parece claro que la postura del referido juez realmente no fue otra que, a base de la limitada prueba que tuvo ante sí y de la inconsistencia evidenciada por E.G.R. de retractarse de su testimonio judicial y luego repudiar tal retractación, tenía interrogantes sobre lo declarado por ésta. Esto, sin embargo, no es suficiente para ordenar la celebración de un nuevo juicio, ante la escasa confiabilidad de la retractación, como hemos señalado antes. Los casos de retractación de testimonio judicial consisten precisamente de la existencia de una contradicción en lo declarado por un testigo. Inevitablemente, siempre traen aparejadas interrogantes e incertidumbres obvias. Pero ese solo dato no puede ser suficiente para ordenar un nuevo juicio, porque entonces sería automático o mandatorio celebrarlo cada vez que surgiese una retractación. En otras palabras, cuando la pregunta crucial es si una retractación es tan convincente que justifique un nuevo juicio, no puede responderse en la afirmativa, que porque hay contradicción de testimonio debe celebrarse el nuevo juicio, sin incurrir a la vez en un inaceptable e ilógico razonamiento circular. Lo esencial no es si la retractación crea incertidumbre o delata que el testigo no haya dicho la verdad siempre. Lo importante es si la retractación ocurre en circunstancias tales que la hagan *confiable*, y por lo tanto existan graves dudas sobre la veracidad del testimonio que el testigo en cuestión ofreció *en el juicio*. Tal no es la situación en el caso ante nos. Aquí la testigo E.G.R. *ya había incurrido en contradicciones en los procedimientos judiciales originales*. Aun así, declaró en el juicio de un modo tan contundente y tan creíble sobre lo que había sucedido, que el juzgador, con autoridad para hacerlo, decidió que los acusados eran culpables. Su posterior retractación ciertamente no constituye una prueba nueva, puesto que realmente fue sólo una instancia más de su inconsistencia ori-

ginal, posiblemente provocada por partes interesadas; un refrito de la contradicción ya adjudicada. Mas aun en la vista sobre nuevo juicio, la testigo repudió la retractación y reiteró la versión judicial de su testimonio. Sopesados en conjunto todos los testimonios de la menor, no tenemos ante nos una situación de hechos o prueba nueva que "evidencien la inocencia de los acusados" como lo requiere la Regla 192 de Procedimiento Criminal, *supra.*

Finalmente, debe tenerse en cuenta que el tribunal de instancia resolvió correctamente que la "supuesta nueva prueba" estaba esencialmente disponible para la defensa con anterioridad al juicio y que era de naturaleza acumulativa e impugnatoria. Dicha "prueba", en esencia, iba dirigida a restaurar el argumento de los Chévere, tanto en instancia como en apelación, de que la perjudicada era dada a mentir y sus testimonios eran inconsistentes. Como bien señaló el foro a quo, dicha prueba no satisface los requisitos que tradicionalmente hemos exigido para que proceda ordenarse la celebración de un nuevo juicio. *Pueblo v. Martínez Ortiz y otros*, supra; *Pueblo v. Torres Rivera*, supra; *Pueblo v. Morales Rivera*, supra; *Pueblo v. González de Demora*, supra; *Pueblo v. Villalongo Torres*, supra; *Pueblo v. Beltrán*, supra; *Pueblo v. Morales*, supra.

Resolvemos, pues, que no abusó de su discreción el tribunal a quo al denegar el nuevo juicio.

## V

Por los fundamentos expuestos anteriormente, procede modificar las sentencias dictadas por el Tribunal Superior de Puerto Rico, Sala de Utuado, para: (1) reducir a 25 años de reclusión las penas impuestas por el delito de violación técnica; (2) para indicar que las penas impuestas a Cruz y a Ángel Chévere, en el caso relacionado a E.G.R., se deberán cumplir de manera concurrente, y (3) para indicar que

las penas impuestas a Ángel Chévere en el caso relacionado a J.R.S. se deberán cumplir de manera concurrente entre sí y consecutivas con las impuestas en el caso relacionado con E.G.R. Procede, también, expedir el auto de *certiorari* y confirmar la resolución recurrida.

*Se dictará sentencia de conformidad.*

El Juez Asociado Señor Hernández Denton concurrió sin opinión escrita. El Juez Asociado Señor Rebollo López disintió sin opinión escrita.