ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| EL PUEBLO DE PUERTO RICO<br><br>Apelado<br><br>v.<br><br>FRANCIS ORTIZ SOLIVAN<br><br>Apelante | KLAN202400771 | *APELACIÓN* procedente del Tribunal de Primera Instancia, Sala Superior de Guayama<br><br>Caso Núm.: G LA2023G0054, G LA2023G0055<br><br>Sobre: Art. 127 (B) código Penal, Art. 6.14 y 6.05 Ley de Armas |

Panel integrado por su presidente, el Bonilla Ortiz, la Jueza Mateu Meléndez y el Juez Sánchez Báez[1]

Sánchez Báez, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 15 de julio de 2025.

Compareció ante nos el Sr. Francis Ortiz Solivan (en adelante, "señor Ortiz Solivan" o "apelante"), mediante recurso de *Apelación* presentado el 16 de agosto de 2024. Nos solicitó la revocación de la *Sentencia Enmendada* emitida el 17 de julio de 2024 por el Tribunal de Primera Instancia, Sala Superior de Guayama (en adelante, "foro primario" o "foro *a quo*"). Mediante esta, el foro primario declaró al señor Ortiz Solivan culpable de violación a los Artículos 6.05 y 6.14(B) de la Ley Núm. 168-2020, según enmendada, conocida como "Ley de Armas de Puerto Rico de 2020", 25 LPRA secs. 466d, 466m (en adelante, "Ley de Armas"); así como el Artículo 127 (b) de la Ley Núm. 146-2012, según enmendada, conocida como "Código Penal de Puerto Rico", 33 LPRA sec. 518d (en adelante, "Código Penal").

Por los fundamentos que discutiremos a continuación, se **confirma** la *Sentencia* apelada.

---

[1] Mediante Orden Administrativa OATA-2025-002 de 9 de enero de 2025, se designó al Hon. Isaías Sánchez Báez en sustitución del Hon. Juan R. Hernández Sánchez.

**-I-**

El Ministerio Público presentó tres (3) denuncias contra el señor Ortiz Solivan por hechos ocurrido el 13 de noviembre de 2022. Luego de la determinación de causa para acusar, el Ministerio Público presentó las acusaciones correspondientes. A saber, se le acusó de: (1) apuntar y amenazar con un arma de fuego al Sr. Rafael Ramos Torres (en adelante, "señor Ramos Torres"), una persona de edad avanzada; (2) portar un arma de fuego sin tener licencia vigente para ello, y (3) apuntar y colocar un arma de fuego en al frente del señor Ramos Torres sin tener licencia para vigente para ello.

Luego de los trámites pertinentes, se celebró juicio en su fondo los días 22 y 23 de abril de 2024 al igual que el día 20 de mayo de 2024. Aquilatada la prueba presentada en el juicio, 17 de julio de 2024, el foro primario emitió *Sentencia Enmendada.* Específicamente, mediante esta declaró al señor Ortiz Solivan culpable de los siguientes delitos: (i) violación al Artículo 6.05 de la Ley de Armas y lo sentenció a 10 años de reclusión; (ii) violación al Artículo 6.14(B) de la Ley de Armas y lo sentenció a 5 años de reclusión; y (iii) violación al Artículo 127(B) del Código Penal. Además, por todos estos delitos fue sentenciado a una pena de reclusión de 5 años y 3 meses adicionales por concepto de reincidencia simple.

Inconforme, 16 de agosto de 2024, el señor Ortiz Solivan acudió ante nos mediante el recurso de Apelación y planteó la comisión del error siguiente:

> ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL ENCONTRAR CULPABLE EN VIRTUD DE UN PRUEBA QUE NO DERROTÓ MI PRESUNCIÓN DE INOCENCIA Y MUCHO MENOS ESTBLECIÓ MI CULPABILIDAD MÁS ALLÁ DE DUDA RAZONABLE.

Conforme a lo dispuesto en la Regla 29 del Tribunal de Apelaciones, 4 LPRA XXII-B, R. 29, y por argüirse que el foro primario erró en la apreciación de prueba oral, el apelante presentó

ante esta Curia la transcripción del juicio. Esta se quedó como estipulada por las partes el 23 de enero de 2025. Por consiguiente, el 4 de marzo de 2025, el apelante presentó su alegato.

Por su parte, el 24 de marzo de 2025, la Oficina del Procurador General presentó el *Alegato del Pueblo*.

Con el beneficio de la comparecencia de ambas partes y la transcripción de la prueba oral, procedemos a exponer la normativa jurídica aplicable al caso ante nuestra consideración.

**-II-**

**A. Presunción de inocencia y duda razonable**

La Constitución de Puerto Rico reconoce en la Sección 11 del Artículo II el derecho fundamental de la presunción de inocencia. Const. PR art. II, sec. 11. Esto es que un acusado no tiene la obligación de presentar prueba en su defensa o de que es inocente. *Pueblo v. Meléndez Monserrate*, 2024 TSPR 80, pág. 9, 214 DPR 547 (2024). Entiéndase, le corresponde al Estado la obligación de presentar evidencia y de cumplir con la carga de la prueba para establecer la culpabilidad del acusado. *Pueblo v. Negrón Ramírez*, 213 DPR 895, 907 (2024); *Pueblo v. Irizarry*, 156 DPR 780, 786-787 (2002). A los fines de rebatir esa presunción, las reglas 110 de Procedimiento Criminal y de Evidencia requieren que la culpabilidad de una persona acusada sea probada más allá de duda razonable. 34 LPRA Ap. II, R. 110 (2016) y 32 LPRA Ap. VI, R. 110 (2021). Para cumplir con ese estándar, y por consiguiente controvertir la presunción constitucional, el Ministerio Público tiene que presentar prueba suficiente y satisfactoria sobre: (1) cada uno de los elementos del delito, (2) su conexión con el acusado y (3) la intención o negligencia criminal de este. *Pueblo v. Meléndez Monserrate*, supra, pág. 9. Cumplir con esa máxima es un imperativo del debido proceso de ley. *Pueblo v. Irizarry*, supra, pág. 786.

Ahora bien, el estándar probatorio de más allá de duda razonable no requiere que se tenga que probar el caso criminal con certeza matemática. *Pueblo v. Negrón Ramírez*, supra, pág. 907; *Pueblo v. Toro Martínez*, 200 DPR 834, 856 (2018); *Pueblo v. Bigio Pastrana*, 116 DPR 748, 761 (1985). Lo que nuestro ordenamiento jurídico requiere es prueba suficiente y satisfactoria, es decir, que produzca certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido. *Pueblo v. Toro Martínez*, supra. Por ende, la duda razonable que impide encontrar culpable al acusado no es una mera duda especulativa o imaginaria, o cualquier duda posible; es la insatisfacción racional de la conciencia del juzgador con la prueba presentada producto de todos los elementos de juicio del caso. *Íd.*, Véase, además, *Pueblo v. Irizarry*, supra, pág. 788; *Pueblo v. Bigio Pastrana*, supra, pág. 761. Es decir, "la duda razonable debe ser el resultado de la consideración serena, justa e imparcial de la totalidad de la evidencia del caso o de la falta de suficiente prueba en apoyo de la acusación". *Pueblo v. Irizarry*, supra. Como bien dispuso el Tribunal Supremo: "[e]n concreto, la duda razonable existe cuando el juzgador de los hechos siente en su conciencia insatisfacción o intranquilidad con la prueba de cargo presentada". *Pueblo v. García Colón I*, 182 DPR 129, 175 (2011). De igual modo ocurre "cuando el juzgador queda insatisfecho con la prueba presentada". *Pueblo v. Santiago*, 176 DPR 133, 142 (2009).

La determinación de si se probó la culpabilidad del acusado más allá de duda razonable es revisable en apelación. *Pueblo v. Negrón Ramírez*, supra, pág. 909. Ahora bien, en esa delicada función revisora se debe tener presente que "la apreciación de la prueba corresponde, en primera instancia, al foro sentenciador por lo cual los tribunales apelativos sólo intervendremos con dicha apreciación cuando se demuestre la existencia de pasión, prejuicio, parcialidad o error manifiesto". *Pueblo v. Irizarry*, supra, págs. 788-

789. Véase, además, *Pueblo v. Maisonave Rodríguez*, 129 DPR 49, 63 (1991). Asimismo, podremos intervenir cuando la apreciación de la prueba no concuerde con la realidad fáctica o esta sea inherentemente imposible o increíble. *Pueblo v. Irizarry*, supra, pág. 789.

Esta norma se fundamenta en el hecho de que "los foros de instancia están en mejor posición para evaluar la prueba desfilada, pues tienen la oportunidad de observar y escuchar a los testigos y, por ello, su apreciación merece gran respeto y deferencia". *Pueblo v. Acevedo Estrada*, 150 DPR 84, 99 (2000). Por tal razón, se les concede gran deferencia a las determinaciones de hechos realizadas por los juzgadores de instancia, así como a las adjudicaciones de credibilidad que éstos hacen sobre los testigos que declaran ante ellos. *Pueblo v. Negrón Ramírez*, supra, pág. 909.

De otro lado, nuestro ordenamiento jurídico no requiere una cantidad específica de testigos para probar la culpabilidad de un acusado más allá de duda razonable. *Pueblo v. Toro Martínez*, supra, pág. 859. Al contrario, el testimonio de un testigo por sí solo, de ser creído, es suficiente para sostener un fallo condenatorio aun cuando no fue un testimonio perfecto. Le corresponde al foro primario resolver los asuntos de credibilidad de un testigo cuando haya partes de su testimonio que sean aceptables. *Íd.*, pág. 860. Véase, además, *Pueblo v. Chévere Heredia*, 139 DPR 1, 15-16 (1995). De ese modo, si un testigo se contradice, lo que está en juego es su credibilidad y es al foro primario a quien le corresponde resolver el valor probatorio de su testimonio. *Pueblo v. Toro Martínez*, supra, pág. 861. Adviértase que el testimonio perfecto no existe, y en lugar de ser indicativo de la verdad, es altamente sospecho, pues generalmente es producto de fabricación. *Pueblo v. Cabán Torres*, 117 DPR 645, 656 (1986).

Discutido el derecho aplicable, este Tribunal se encuentra en posición para resolver las controversias señaladas en el recurso de epígrafe.

**-III-**

En esencia, el apelante planteó que el foro primario incidió al hallarlo culpable a pesar de que el Ministerio Público no rebatió el *quantum* de prueba requerido ni probó su caso más allá de duda razonable. Con exactitud señaló que ni siquiera demostró que el señor Ortiz Solivan hubiese portado un arma de fuego. Alegó que el video estipulado por ambas partes lo único que demostró fue una discusión acalorada entre el señor Ramos Torres y el apelante, quien tenía las manos libres sin ningún arma. Añadió que del video ni surge que el apelante estuviese tratando de ocultar un arma ni sus pantalones estaban abultados. Por último, señaló que el transcurso alrededor de tres meses desde la ocurrencia del incidente hasta la presentación de la querella demostró que el señor Ramos Torres no sentía temor.

Por su parte, el Procurador General arguye que se demostró más allá de duda razonable los elementos de los delitos imputados y que fue el apelante quien los cometió, derrotando así su presuncion de inocencia. Particularmente, argumentó que de la prueba testifical se desprendía que el apelante intervino con el señor Ramos Torres con un arma de fuego y lo amenazó de muerte en varias ocasiones. A su vez, alegó que la Sra. Nereida Hernández Hernández (en adelante, "señora Hernández Hernández") presenció parte del mencionado incidente y grabó un video de ello, el cual demostró con claridad la identidad del apelante. Adujo, además, que resulta pertinente confirmar la *Sentencia* apelada, toda vez que las determinaciones del foro primario basadas en la apreciación de la prueba merecen gran deferencia por este Tribunal revisor.

Tras analizar la Transcripción de la Prueba Oral, se desprende que el Ministerio Público presentó como *exhibit* —sin objeción de la defensa— un formulario de consentimiento a un registro y un video.[2] Asimismo, consta que presentó los testimonios del señor Ramos Torres y, su esposa, la señora Hernández Hernández.[3] Para facilitar la comprensión de nuestro análisis, procedemos a resumir la prueba testifical pertinente que tuvo ante si el foro primario. Veamos.

**1. Testimonio del señor Ramos Torres**

En primer lugar, el señor Ramos Torres durante su testimonio indicó que a la fecha del incidente tenía sesenta y dos (62) años[4] y vivía con su esposa e hija[5]. Identificó al señor Ortiz Solivan en corte abierta[6] y, además, sostuvo que era su "vecino de toda la vida de pequeño"[7]. Manifestó, a su vez, que la casa del apelante ubica en la esquina de la calle, la cual colinda con la suya que es la segunda casa.[8]

En relación con los hechos que nos concierne, explicó que, el 13 de noviembre de 2022 entre las 11:00am a 12:00pm, salió de su casa caminando en dirección a la casa de sus hermanos, la cual ubica tres (3) casas delante de la suya.[9] Tras unos breves sucesos que resultan inmeritorios pormenorizar, detalló que cuando se disponía a regresar a su casa tomó "la [a]cera de la esquina de la casa de él[,] [d]e don Francis"[10] e indicó como sigue: "cuando tiro el primer paso ahí mismo él me pega la pistola"[11]. Continúo declarando en torno al arma de fuego que, el apelante "la chambonea con la mano izquierda. La coge con las dos manos y me empieza a decir: te

---

[2] Transcripción de la Prueba Oral (en adelante, "TPO"), págs. 3-4.
[3] TPO, pág. 5; pág. 18, líneas 16-22; pág. 19, línea 1.
[4] TPO, pág. 14, líneas 9-11.
[5] TPO, pág. 13, líneas 17-20.
[6] TPO, pág. 14, líneas 18-21; pág. 15, líneas 1-5.
[7] TPO, pág. 15, línea 8.
[8] TPO, pág. 16, líneas 15-18; pág. 17, líneas 6-9.
[9] TPO, págs. 18-19.
[10] TPO, pág. 20, líneas 17-21; pág. 21, línea 1.
[11] TPO, pág. 22, línea 8.

voy a matar, te voy a matar so. Hijo de puta".[12] Añadió que le respondió "¿Qu[é] yo te he hecho? Él dice: deja de estar jodiendo conmigo. Tú me estás cortando el cable. Que, que, que tú me estás robando el Internet. Que si le está[s] robando a una viejita"[13]. Además, explicó con especificidad que el apelante le colocó una "pistola negra cuadrada" en el área de su cabeza[14]. A preguntas del fiscal, indicó que se sintió como sigue: "yo estoy frisado porque yo tengo la pistola en la en la cabeza y yo, me cogió como imprevisto como quien dice… Puedo estar frisado, anonadado. Que inclusive en segundo alzó las manos que me pudo haber matado".[15]

Especificó que, en el momento que ocurrió el mencionado incidente, solo estaban presentes el apelante y él.[16] No obstante, agregó que, la señora Hernández Hernández —su esposa— estaba tendiendo ropa a fuera de su casa y, al ella darse cuenta de la situación, se metió adentro de la casa a buscar su celular para grabar el incidente.[17] Declaró que acto seguido el señor Ortiz Solivan ve a la señora Hernández Hernández con el celular y esconde el arma de fuego en su espalda.[18] Explicó que la señora Hernández Hernández se acercó hacia ellos dos, mientras grababa con el celular, y le dijo al apelante lo siguiente: "pero ven acá, si yo pago Internet, si yo tengo Internet. Yo no tengo que estar robándote cable".[19] Expresó que, mientras lo anterior acontecía, llegó el padrastro del apelante, quien se encargó entrar al señor Ortiz Solivan a la casa.[20] Luego de eso, aseguró que él y su esposa volvieron a su residencia.[21]

---

[12] TPO pág. 23, líneas 2-4.
[13] TPO, pág. 25, líneas 9-10.
[14] TPO, pág. 23, línea 10-17.
[15] TPO, pág. 25, líneas 4-6.
[16] TPO, pág. 25, líneas 20-22; pág. 26, línea 1.
[17] TPO, pág. 28, líneas 3-4; pág. 29, líneas 15-17.
[18] TPO, pág. 29, líneas 7-8.
[19] TPO, pág. 29, líneas 12-13.
[20] TPO, pág. 31, líneas 18
[21] TPO, pág. 32, líneas 1-4.

En cuanto al video, el señor Ramos Torres declaró que — aunque "no se ve la pistola [porque] cuando mi esposa llegó, él ya la había escondido"[22]— refleja al apelante con la mano detrás de la cintura mientras le gritaba improperios.[23]

A preguntas de la defensa, explicó que el día del incidente no llamó a la policía "porque tenía miedo, tenía temor"[24] y que no fue hasta mediados de enero de 2023 que hizo la querella contra el apelante.[25] No obstante, aceptó que en diciembre de 2022 sucedió otro incidente con el señor Ortiz Solivan, el cual detalló como sigue: "[m]e rompió una ventana y por poco me mata a la nena con una piedra".[26] Prosiguió declarando que, debido a ello, la señora Hernández Hernández solicitó una orden de protección a favor de su hija.[27]

## 2. Testimonio de la señora Hernández Hernández

En lo pertinente, la señora Hernández Hernández explicó que el señor Ramos Torres era su compañero.[28]  En relación al señor Ortiz Solivan, indicó que era su vecino "por mucho tiempo [...] como 20 años por ahí, más o menos".[29] Además, detalló que su residencia ubica "al lado de la casa de[l] [señor Ortiz Solivan]".[30]

Declaró que, el 13 de noviembre de 2022, estaba tendiendo ropa en el exterior de su casa[31] y oyó la voz de su esposo, el señor Ramos Torres, quien venía de regreso para la casa.[32] Acto seguido, vio al señor Ortiz Solivan salir con una pistola negra y la chambonea.[33] En particular, detalló que "cuando él [señor Ortiz Solivan] sale, yo automática sabía que era para él [su esposo], me

---

[22] TPO, pág. 36, líneas 14-15.
[23] TPO, pág. 36, líneas 1-6.
[24] TPO, pág. 39, línea 9.
[25] TPO, pág. 45, líneas 11-22.
[26] TPO, pág. 48, línea 14.
[27] TPO, pág. 49, líneas 5-9.
[28] TPO, pág. 85, línea 21; pág. 86, línea 1.
[29] TPO, pág. 86, líneas 19-20.
[30] TPO, pág. 87, línea 12.
[31] TPO, pág. 88, línea 11; pág. 142, líneas 9-12.
[32] TPO, pág. 90, líneas 17-22; pág. 142, líneas 9-12.
[33] TPO, pág. 89, línea 20; pág. 90, línea 2; pág. 142, líneas 12-13.

meto para la casa. Corriendo y cogí mi celular".[34] Además, manifestó que el propósito de buscar su celular era para grabar y obtener pruebas de lo que estaba sucediendo.[35] Destacó, a su vez, que empezó a grabar desde que salió de su casa[36] y que allí estaban presentes el señor Ortiz Solivan, el señor Ramos Torres, ella y posteriormente, su hija[37]. Asimismo, expresó que el señor Ortiz Solivan "estaba alegándole a mi esposo que le estaba y que robando el Wifi. Por eso fue".[38] Añadió que el señor Ortiz Solivan le dijo a su esposo que "era un pillo. Le decía palabras soeces, malas palabras [...]"[39] y describió su actitud como una persona enojada, arrogante y descontrolada[40]. Resaltó que, en algún momento del incidente, le dijo al señor Ortiz Solivan "es que yo pago mi internet, yo tengo prueba, yo pago mi internet, yo no tengo que estar robándote a ti el Internet".[41] Luego, declaró que llegó el padrastro del señor Ortiz Solivan, quien se encargó de bregar con este último.[42] Por último, declaró que "no sé llamó la policía en ese momento. Dicho porque mi esposo dijo estas palabras, él es de la calle, no se sabe con quién él venga y estamos solos aquí tú la nena y yo".[43]

A preguntas de la defensa, sostuvo que no recordaba la hora exacta en que ocurrió el incidente, ya que habían pasado dos años.[44] Además, explicó el cordel donde estaba tendiendo la ropa ubica cerca de la acera.[45] Asimismo, afirmó que el video que grabó tiene una duración de 8 minutos[46], pero aclaró que el incidente duró aproximadamente 15 minutos.[47] Aceptó, a su vez, que desde donde

---

[34] TPO, pág. 91, líneas, 20-21; pág. 142, líneas 12-15.
[35] TPO, pág. 92, líneas 7-9.
[36] TPO, pág. 92, línea 13.
[37] TPO, pág. 93, líneas 7-8.
[38] TPO, pág. 94, línea 5.
[39] TPO, pág. 95, líneas 6-7.
[40] TPO, pág. 95, líneas 13-16.
[41] TPO, pág. 96, líneas 12-14.
[42] TPO, pág. 96, líneas 3-10.
[43] TPO, pág. 99, líneas 1-3.
[44] TPO, pág. 103, líneas 1-12.
[45] TPO, pág. 109, líneas 9-15.
[46] TPO, pág. 110, líneas 15-21.
[47] TPO, pág. 111, líneas 2-3.

estaba tendiendo la ropa no vio a su esposo, sino que lo escuchó.[48]

Reiteró que vio al señor Ortiz Solivan salir de su casa con una pistola negra y cuadrada.[49] Por último, admitió que en el video no revela ninguna arma de fuego[50], pero que al señor Ortiz Solivan "se le veía con las manos atrás"[51].

Tras finalizar el desfile de prueba testifical, el Ministerio Público colocó a disposición de la defensa el testimonio del agente investigador, quien realizó una certificación negativa de licencia para portación de armas.[52] No obstante, la defensa entrevistó al agente investigador e indicó que no estaría utilizando su testimonio.[53]

Así pues, resumida la prueba testifical que tuvo ante sí el juzgador de los hechos, pasamos a evaluarla a la luz del derecho aplicable.

Según explicamos en el acápite II de esta *Sentencia*, es norma constitucional conocida en nuestra jurisdiccion que un acusado en un procedimiento criminal goza de una presuncion de inocencia. Además, adelantamos que nuestras Reglas de Procedimiento Criminal establecen que los acusados se presumirán inocentes, mientras no se pruebe lo contrario, y en caso de existir duda razonable acerca de su culpabilidad, se le absolverá. 34 LPRA Ap. II, R. 110 (2016). De manera que es responsabilidad del Ministerio Público presentar evidencia y cumplir con el peso probatorio para demostrar, sin dejar lugar a dudas razonables, todos los elementos del delito, la intención criminal y la conexión del acusado con los hechos. *Pueblo v. Meléndez Monserrate*, supra, pág. 9

---

[48] TPO, pág. 115, líneas 8-15; pág. 116, líneas 11-21.
[49] TPO, pág. 119, líneas 3-22; pág. 120, líneas 1-3.
[50] TPO, pág. 131, líneas 12-15; pág. 132, líneas 9-13.
[51] TPO, pág. 133, línea 3.
[52] TPO, pág. 143, líneas 9-12.
[53] TPO, pág. 143, líneas 18-22; pág. 144, líneas 1-7.

Reiteramos que, la norma en estos asuntos es que le corresponde al foro primario resolver los asuntos de credibilidad de los testigos y a quien le atañe examinar el valor probatorio de los testimonios ofrecidos en corte. Este foro apelativo intermedio no intervendrá con esa función judicial a menos que haya ocurrido pasión, prejuicio, parcialidad o error manifiesto por parte del foro *a quo*. *Pueblo v. Irizarry*, supra, págs. 788-789.

Tomando lo anterior en consideración, este tribunal examinó detenidamente el expediente de epígrafe, así como la TPO estipulada por las partes, y concluimos que no están esos elementos que motiven a este foro a intervenir con la determinación apelada.

Nótese, pues, que se estableció que el 13 de noviembre de 2022 el apelante le apuntó al señor Ramos Torres con una "pistola negra cuadrada" en la cabeza, mientras este último iba caminando hacia su residencia.[54] De igual forma, la prueba demostró que ese día, mientras el apelante le apuntó al señor Ramos Torres con el arma de fuego le dijo: "te voy a matar, te voy a matar so. Hijo de puta".[55] Asimismo, se demostró que, el mencionado incidente ocurrió solamente ante la presencia del apelante y el señor Ramos Torres.[56] Esto es, que ninguna otra persona presenció tales hechos. No obstante, se demostró que la señora Hernández Hernández estaba tendiendo ropa a fuera de su casa cuando escuchó la voz del señor Ramos Torres, quien llegaba de regreso a la casa y, acto seguido, vio al apelante salir con una pistola negra cuadrada, la cual "chambonea".[57] Tras esa situación, se demostró que la señora Hernández Hernández se metió adentro de su casa a buscar su

---

[54] TPO, pág. 20, líneas 17-21; pág. 21, línea 1; pág. 22, líneas 1-12; pág. 23, líneas 9-17.
[55] TPO, pág. 23, líneas 1-4.
[56] TPO, pág. 25, líneas 20-22; pág. 26, línea 1.
[57] TPO, pág. 27, líneas 20-22; pág. 28, líneas 1-4; pág. 29, líneas 1-17; pág. 88, línea 11; pág. 89, línea 20; pág. 90, líneas 2, 17-22; pág. 119, líneas 3-22; pág. 120, líneas 1-3; pág. 142, líneas 9-12.

celular para grabar el incidente y que, en efecto, lo grabó.[58] En cuanto al video, quedó establecido que tiene una duración de alrededor de 8 minutos.[59] A su vez, tanto el señor Ramos Torres como la señora Hernández Hernández aceptaron que en el mencionado video no se visualizó el arma de fuego que utilizó el apelante, sino que "se le veía con las manos atrás" de la cintura.[60] Sin embargo, quedó establecido que el video reflejó al apelante enojado, descontrolado, diciendo palabras soeces y alegando que le estaban robando internet. [61]

A nuestro juicio, el hecho de que el video no refleje directamente el arma de fuego no implica que el testimonio del señor Ramos Torres y la señora Hernández Hernández, prestado bajo juramento, carezca de veracidad. En este sentido, dicha circunstancia no constituye fundamento para alterar el fallo condenatorio. Así pues, no estamos ante un escenario en el que debemos sustituir el valor adjudicado que le dio el foro primario a los testimonios del señor Ramos Torres y la señora Hernández Hernández. Por el contrario, entendemos como adecuada su versión para respaldar la condena recaída en contra del señor Ortiz Solivan. Por tanto, concluimos que los testimonios vertidos en juicio fueron suficientes para probar más allá de toda duda razonable todos los elementos del delito, la intención criminal del apelante y su vinculación con los sucesos del caso.

En fin, no hemos hallado indicador alguno que nos obligue a no concederle gran deferencia a las adjudicaciones de credibilidad que efectuó el juzgador de instancia sobre los testigos que declararon ante sí. *Pueblo v. Negrón Ramírez,* supra, pág. 909. Fue

---

[58] TPO, pág. 28, líneas 1-4; pág. 29, líneas 1-17; pág. 91, líneas, 20-21; pág. 92, líneas 7-13; pág. 142, líneas 12-15.
[59] TPO, pág. 110, líneas 15-21.
[60] TPO, pág. 36, líneas 1-6; pág. 131, líneas 12-15; pág. 132, líneas 9-13; pág. 133, línea 3.
[61] TPO, pág. 94, línea 5. pág. 95, líneas 6-13.

el distinguido juzgador de hechos que tuvo la oportunidad de oír, ver y apreciar el comportamiento de los testigos. *Íd.*, pág. 910. Tampoco surge del análisis de la prueba que hubiera mediado pasión, prejuicio o parcialidad o algún error manifiesto llevado a cabo por el foro primario. Al examinar la prueba, notamos que la misma concuerda con la realidad fáctica de lo ocurrido el día de los hechos. Es decir, entendemos que, a la luz de la prueba admitida, no existe base suficiente que apoye la contención del señor Ortiz Solivan en su recurso, a los efectos de que el Ministerio Público no logró establecer su culpabilidad más allá de toda duda razonable. Más aún cuando el acto de aquilatar y apreciar la prueba está investido con "la alta dignidad de la magistratura en la función juzgadora de la conducta de los hombres, y no es para echarse a un lado con liviandad e indiferencia". *Pueblo v. Figueroa Rosa*, 112 DPR 154, 159 (1992). Así pues, al adoptar esta determinación, no tenemos inquietud ni insatisfacción en nuestra conciencia respecto a la prueba presentada. Procede, por tanto, confirmar el dictamen apelado.

**-IV-**

Por los fundamentos previamente expuestos, se **confirma** la *Sentencia* apelada.

Lo acordó el Tribunal y lo certifica la secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones